JAMES A. SAVILLE, JR.
JUSTIN M. HEILIG
**HILL RIVKINS & HAYDEN LLP**
Attorneys for Plaintiff
45 Broadway – Suite 1500
New York, NY 10006
(212) 669-0600



**JUDGE BERMAN**

# '09 CIV 7304

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CONSOLIDATED PIPE CARRIERS PTE LTD,

Plaintiff,

- against -

TRIDENT AUSTRALASIA FZE and
TRIDENT AUSTRALASIA PTY LTD.,

Defendants.

09 CV _____

**VERIFIED COMPLAINT**

09 CV 7304

Plaintiff, Consolidated Pipe Carriers Pte Ltd. ("CPC"), by and through its attorneys Hill
Rivkins & Hayden LLP, as and for its Verified Complaint against the above-named Defendants,
alleges upon information and belief as follows:

## JURISDICTION

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure and this Honorable Court has jurisdiction pursuant to 28 U.S.C.
§1333.

## PARTIES

2.     At and during all material times hereinafter mentioned, Plaintiff was and now is a
business entity organized and existing by virtue of foreign law with an office and principal place
of business at 152 Beach Road # 12-03, Gateway East, Singapore 189721.

3.      At and during all material times hereinafter mentioned, defendant Trident Australasia FZE ("FZE") was and now is a business entity organized and existing by virtue of foreign law with a mailing address of P.O. Box 122319, SAIF-Zone, Sharjah, United Arab Emirates.

4.      At and during all material times hereinafter mentioned, defendant Trident Australasia Pty Ltd. ("Trident") was and now is a business entity organized and existing by virtue of foreign law with an office and principal place of business at 125A Royal Street, East Perth. WA 6004, Australia.

5.      This action is brought to obtain jurisdiction over the Defendants and to obtain security for any judgment or award that is eventually entered against them.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of a Maritime Contract)

6.      Plaintiff repeats and realleges Paragraphs 1 through 5 as if set forth herein at length.

7.      On or about January 3, 2009, CPC, as owner, chartered the tug MARINA HARMONY to FZE, as charterer, on the SUPPLYTIME 89 form ("the Tug Charter") with attached riders for a period of twenty (20) days firm with twenty (20) daily options to extend by mutual agreement.  According to Boxes 19 - 23 of the Tug Charter, hire payments were to be made by FZE at the rate of US$4,000 per calendar day immediately upon receipt of the invoices issued by CPC, in accordance with terms stated thereon.  Box 22 additionally set the interest rate payable by FZE under the Tug Charter at 1% per month.

8.      Pursuant to Clauses 2 and 3 of the Tug Charter, CPC delivered the MARINA HARMONY to FZE on January 13, 2009, fully capable of performing as described, and has otherwise fulfilled all of its duties and obligations under the Tug Charter.

9.      CPC and FZE subsequently executed an addendum to the Tug Charter, with effective date of February 17, 2009, extending the firm period of hire until March 5, 2009 at the same rate of hire and under the same terms and conditions.  The parties executed a similar

addendum, effectively dated March 3, 2009, extending the period until March 19, 2090. A true and accurate copy of the Tug Charter with addenda is attached hereto as Exhibit 1.

10.     The MARINA HARMONY, however, remained in FZE's service my mutual agreement of the parties until April 6, 2009. A true and accurate copy of the Certificate of Re-Delivery is attached hereto as Exhibit 2.

11.     CPC invoiced FZE for hire due under the Tug Charter on four separate occasions, between January 21, 2009 to April 6, 2009, which FZE failed to pay in accordance with the terms of Boxes 22 and 23. CPC then provided a Statement to FZE, dated July 31, 2009, showing the total amount due, inclusive of interest levied at the 1% per month rate specified in Box 22. A true and accurate copy of the Statement is attached hereto as Exhibit 3.

12.     Of the total hire earned, FZE has failed to pay CPC in the amount of US$251,390.06. Interest has continued to accrue at the daily rate of $82.91. Accordingly, CPC will shortly commence arbitration in Singapore against FZE to recover the unpaid hire, plus interest, pursuant to Boxes 22 and 33 of the Tug Charter. Under Singapore law, a prevailing party is normally awarded attorneys' fees and costs.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of a Maritime Contract)

13.     Plaintiff repeats and realleges Paragraphs 1 through 11 as if set forth herein at length.

14.     On or about January 3, 2009, CPC, as owner, chartered the barge CPC 2808 to FZE, as charterer, on the BARGEHIRE 94 form ("the Barge Charter") with attached riders for a period of twenty (20) days firm with twenty (20) daily options to extend by mutual agreement. According to Boxes 24 – 27 of the Barge Charter, hire payments were to be made by FZE at the rate of US$2,200 per day upon receipt of the invoices issued by CPC, in accordance with terms stated thereon. Box 25 additionally set the interest rate payable by FZE under the Barge Charter at 1% per month.

15.     Pursuant to Clause 3 of the Barge Charter, Plaintiff delivered the CPC 2808 to FZE on January 13, 2009, fully capable of performing as described, and has otherwise fulfilled all of its duties and obligations under the Barge Charter.

16.     CPC and FZE subsequently executed an addendum to the Barge Charter, with effective date of February 17, 2009, extending the firm period of hire until March 5, 2009 at the same rate of hire and under the same terms and conditions. The parties executed a similar addendum, effectively dated March 2, 2009, extending the period until March 19, 2090. A true and accurate copy of the Barge Charter with addenda is attached hereto as Exhibit 4.

17.     The CPC 2808, however, remained in FZE's service my mutual agreement of the parties until April 6, 2009.

18.     CPC invoiced FZE for hire due under the Barge Charter on four separate occasions, between January 31, 2009 to April 6, 2009, which FZE failed to pay in accordance with the terms of Boxes 26 and 27. CPC then provided a Statement to FZE, dated July 31, 2009, showing the total amount due, inclusive of interest levied at the 1% per month rate specified in Box 25. A true and accurate copy of the Statement is attached hereto as Exhibit 5.

19.     Of the total hire earned, FZE has failed to pay CPC in the amount of US$184,800.00. Interest has continued to accrue at the daily rate of $60.76. Accordingly, CPC will shortly commence arbitration in Singapore against FZE to recover the unpaid hire, plus interest, pursuant to Boxes 25 and 35 of the Barge Charter. Under Singapore law, a prevailing party is normally awarded attorneys' fees and costs.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Breach of a Maritime Contract)**

20.     Plaintiff repeats and realleges Paragraphs 1 through 18 as if set forth herein at length.

21.     On or about January 7, 2009, CPC, as owner, chartered the crew boat EXPRESS 23 to FZE, as charterer, on the SUPPLYTIME 89 form ("the Express Charter") with attached

4

riders for a period of thirty (30) days firm with an option to extend by twenty (20) days or mutual agreement. According to Boxes 19 – 23 of the Express Charter, hire payments were to be made by FZE ten (10) days after invoice by CPC (in accordance with terms stated thereon) at the rate of US$2,800 per day.

22.     Pursuant to Clauses 2 and 3 of the Express Charter, CPC delivered the EXPRESS 23 to FZE on January 17, 2009, fully capable of performing as described, and has otherwise fulfilled all of its duties and obligations under the Express Charter.

23.     CPC and FZE subsequently executed an addendum to the Express Charter, with effective date of February 15, 2009, extending the firm period of hire until March 5, 2009 at the same rate of hire and under the same terms and conditions. The parties executed a similar addendum, effectively dated March 2, 2009, extending the period until March 19, 2090. A true and accurate copy of the Express Charter with addenda is attached hereto as Exhibit 6.

24.     The EXPRESS 23, however, remained in FZE's service my mutual agreement of the parties until May 20, 2009. A true and accurate copy of the Certificate of Re-Delivery is attached hereto as Exhibit 7.

25.     CPC invoiced FZE for hire due under the Express Charter on April 1, 2009 and May 20, 2009, which FZE failed to pay in accordance with the terms of Boxes 22 and 23. CPC then provided a Statement to FZE, dated July 31, 2009, showing the total amount due. A true and accurate copy of the Statement is attached hereto as Exhibit 8.

26.     Of the total hire earned, FZE has failed to pay Plaintiff in the amount of US$138,876.60. Accordingly, CPC will shortly commence arbitration under English in Dubai, U.A.E. against FZE to recover the unpaid hire, pursuant to Box 33 of the Express Charter. Under English law, a prevailing party is normally awarded attorneys' fees and costs.

27.    In sum, the total due and owing CPC under the Tug, Barge, and Express Charters can be calculated as follows:

```
Unpaid Hire (Tug) ..................................$251,390.06
Unpaid Hire (Barge) .............................$184,800.00
Unpaid Hire (Express) ..........................$138,876.60
Interest (Tug) .........................................$16,358.59
Interest (Barge) ......................................$11,156.07
Est. Costs/Fees (Singapore) ..................$150,000.00
Est. Costs/Fees (Dubai) ..........................$50,000.00
Total .....................................................$802,581.32
```

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Alter Ego)

28.    Plaintiff repeats and realleges Paragraphs 1 through 27 as if set forth herein at length.

29.    Upon information and belief, FZE is a closely-held shell corporation or alter ego of Trident, such that Trident dominates and disregards the corporate form of FZE and is actually carrying on the business and operations of FZE as if they were its own.

30.    Upon information and belief, Trident acts as a paying and/or receiving agent for FZE, such that there is an intermingling of funds between the two entities.

31.    Upon information and belief, Trident pays the debts of FZE. Attached hereto as Exhibit 9 are three wire transfer reports issued by Nordea Bank, confirming that it had credited an account with funds owed by FZE but remitted by Trident, which were submitted in support of a separate Rule B action against the Defendants. *See Int'l Bunkering (Middle East) DMCC v. Trident Australasia FZE*, 09-CV-07160 (DC). It is not the general practice in the maritime industry for independent companies to make payments on behalf of other companies.

32.    Upon information and belief, both Trident and FZE are controlled by or for the benefit of the same officers, directors, and/or individuals. Accordingly, Plaintiff has received correspondence from Trident's Chief Operating Officer, Gary Bradford, regarding FZE's non-

payment under the Tug, Barge, and Express Charters on Trident Australia Pty Ltd.'s letterhead. Moreover, Trident's Managing Director, Peter Cox, signed both the Tug and Barge Charters on behalf of FZE.

33.    In its marketing literature, the "Trident Group of Companies" website names Perth, Australia as its "head office" and describes Sharjah, UAE as a mere "branch office." A true and accurate copy of a screenshot taken from the website on August 18, 2009 is attached hereto as Exhibit 10.

34.    By reason of the foregoing premises, defendant Trident should bear the same liability as its alter ego FZE under the Tug, Barge, and Express Charters and should be liable with respect to the underlying breach of maritime contract claims.

## DEFENDANTS CANNOT BE FOUND IN THE S.D.N.Y.

35.    After due investigation, Plaintiff respectfully submits that the Defendants cannot be "found" in this District for purposes of and as delineated in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

36.    The Tug, Barge, and Express Charters all specifically called for FZE to make hire payments in U.S. dollars in accordance with CPC's invoice instructions. Said invoices have additionally instructed FZE to make payment to New York. Plaintiff is thus informed that Defendant transacts business in this District in U.S. currency and has, or will shortly have, assets, including but not limited to, cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and sub-charter hire, within this District, at or being transferred and/or wired to, from or through Bank of America; Barclays Bank; HSBC; JPMorgan Chase Bank; Standard Chartered Bank; Citibank N.A.; ANZ; Commonwealth Bank of Australia; RBS; US Bank; Arab Bank; Bank of New York; Wachovia Bank; Deutsche Bank; and/or any other garnishee as further investigation may uncover.

37.    There is no statutory or maritime bar to the attachment sought herein.

**W H E R E F O R E**, Plaintiff prays:

1.      That process in due form of law according to the practice of this Court may issue against the Defendants, citing them to appear and answer the foregoing, failing which, a default will be taken against the Defendants for the principal amount of the claim, plus interest, costs and attorneys' fees;

2.      That if the Defendants cannot be "found" within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, that all assets of the Defendants up to and including **$802,581.32** be restrained and attached, including but not limited to cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, at or being transferred and/or wired to, from or through Bank of America; Barclays Bank; HSBC; JPMorgan Chase Bank; Standard Chartered Bank; Citibank N.A.; ANZ; Commonwealth Bank of Australia; RBS; US Bank; Arab Bank; Bank of New York; Wachovia Bank; Deutsche Bank; and/or other garnishees upon who a Writ of Maritime Attachment and Garnishment may be served;

3.      That this Court retain jurisdiction over this matter through the entry of judgment by the arbitration panels in Singapore and Dubai, so that judgment here may be entered in favor of Plaintiff for the amount of its claim, i.e., **$802,581.32**; and

4.      And for such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       August 19, 2009

                         HILL RIVKINS & HAYDEN LLP
                         Attorneys for Plaintiff


                         By: _____
                             James A. Saville, Jr.
                             Justin M. Hellig
                             45 Broadway, Suite 1500
                             New York, New York 10006
                             (212) 669-0600
                             (212) 669-0699

8

## VERIFICATION

I, Justin M. Heilig, hereby affirm as follows:

1.      I am an associate at Hill Rivkins & Hayden LLP, attorneys for plaintiff Consolidated Pipe Carriers Pte Ltd.

2.      I have prepared and read the foregoing Verified Complaint and know the contents thereof and, the same is true to the best of my knowledge, information and belief.

3.      The sources of my knowledge, information and belief are documents provided by our clients and our discussions with them.

4.      As plaintiff is a foreign corporation or other business entity and none of its officers are located in the Southern District of New York, this verification is made by me as counsel of record.

I hereby affirm that the foregoing statements are true and correct.

Dated: New York, New York
       Aug. 19, 2009

_____
Justin M. Heilig

# EXHIBIT 1

| Place and date | UNIFORM TIME CHARTER PARTY |
|---|---|
| Saturday, 03 January 2009 | FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89" |

PART I

| 2. Owners/Place of business (full style, address and telex/Telefax no.) (Cl. 1(a)) | 3. Charterers/Place of business (full style, address and telex/Telefax no.) (Cl. 1(a)) |
|---|---|
| CONSOLIDATED PIPE CARRIERS PTE LTD<br><br>152 Beach Road<br>#12-03 Gateway East<br>Singapore 189721<br><br>Tel: (65) 6341 7887<br>Fax: (65) 6341 7666 | TRIDENT AUSTRALASIA FZE<br><br>P.O. Box 122319<br>SAIF Zone, Sharjah<br>United Arab Emirates<br><br>Tel: (61) 8 92262136<br>Fax:(61) 8 92252120, |

| 4. Vessel's name (Cl. 1(a)) | 5. Date of delivery (Cl. 2(a)) | 6. Cancelling date (Cl. 2(a) and (c)) |
|---|---|---|
| Tugboat ' Marina Harmony ' or ' MLC Nancy 8 ' in owners option | Between 5th and 12th of January 2009 (refer to entire report) — mutual agreement | 12th of January 2009 |

| 7. Port or place of delivery (Cl. 2(a)) | 8. Port or place of redelivery/notice (Cl. 2(a)) |
|---|---|
| Hamriyah Free Zone, Sharjah, U.A.E. | Hamriyah Free Zone, Sharjah, U.A.E.<br>(i) Port or place of redelivery<br><br>Seven (7) Days<br>(ii) Number of days' notice of redelivery |

| 9. Period of hire (Cl. 1(a)) | 10. Extension of period of hire (optional) (Cl. 1(b)) |
|---|---|
| Firm 20 days with 20 daily options further extension upon mutual agreement | (i) Period of extension<br><br>20 daily extensions in charterers option<br>(ii) Advance notice for declaration of option (days)<br>7 days |

| 11. Automatic extension period to complete voyage or well (Cl. 1(a)) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i)) |
|---|---|
| Voyage<br>(i) Voyage or well (state which)<br><br>Subject to mutual agreement<br>(ii) Maximum extension period (state number of days) | N/A<br>(i) Lump sum<br><br>N/A<br>(ii) When due |
| | 13. Port or place of mobilisation (Cl. 2(b)(i))<br>N/A |

| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a)) | 15. Number of days' notice of early termination (Cl. 26(a)) | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a)) |
|---|---|---|
| Same as Box 19 for the remaining charter period as per box 9. | Fourteen (14) days | N/A |

| 17. Area of operation (Cl. 5 (a)) | 18. Employment of vessel restricted to (state nature of service(s) (Cl. 5(a)) |
|---|---|
| Arabian Gulf | As a Towing Tug but always within vessel's capabilities |

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d)) | 20. Extension hire (if agreed, state rate) (Cl. 10(b)) |
|---|---|
| USD 4,000 per calendar day and prorata excluding fuel, lubes, port costs, other taxes levied in the vessel or crew and any other dues levied on the vessel as a result of this charter. | As per box (10)) |

| 21. Invoicing for hire and other payments (Cl. 10(d)) | 22. Payments (state mode and place of payment, also state beneficiary and bank account) (Cl. 10(e)) |
|---|---|
| In Advance<br>(i) state whether to be issued in advance or arrears<br><br>As per Box 2.<br>(ii) state to whom to be issued if addressee other than stated in Box 2<br><br>As per Box 3<br>(iii) state to whom to be issued if addressee other than stated in Box 3 | As per Invoice Instructions |

| 23. Payment of hire, bunker invoices and disbursements for Charterer's account (state maximum number of days) (Cl. 10(e)). | 24. Interest rate payable (Cl. 10(e)) | 25. Maximum audit period (Cl.10(f)) |
|---|---|---|
| Immediate upon receipt of invoice | 1% Per Month | N/A |

| 26. Meals (state rate agreed) (Cl.5(c)(i)) | 27. Accommodation (state rate agreed) (Cl. 5(c)(i)) | 28. Mutual Waiver of Recourse (*optional*, state whether applicable) (Cl. 12(f)) |
|---|---|---|
| N/A | N/A | Applicable |

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b)) | 30. War (state name of countries) (Cl. 19(e)) |
|---|---|
| N/A | Countries of which vessel is employed |

| 31. General average (place of settlement — only to filled in if other than London)(Cl. 21) | 32. Breakdown (state period) (Cl. 26(b)(vi)) |
|---|---|
| Singapore | 48 hours |

| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31 (c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31) | 34. Numbers of additional clauses covering special provisions, if agreed |
|---|---|
| Singapore | N/A |

| 35. Names and addresses for notices and other communications required to be given by *the Owners* (Cl. 28) | 36. Names and addresses for notices and other communications required to be given by *the Charterers* (Cl. 28) |
|---|---|
| As per Box No. 2 | As per Box No. 3 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting PART I, including additional clauses if any agreed and stated in Box 32, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is *optional* and shall only apply if expressly agreed and stated in box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | PETER COX<br>pp. |
| CONSOLIDATED PIPE CARRIERS PTE LTD | TRIDENT AUSTRALASIA |

**1. Period**

1
2 (a) The Owners stated in Box 2 let and the Charterers stated in
3 Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A"
4 (hereinafter referred to as "the Vessel"), for the period as stated in
5 Box 9 from the time the Vessel is delivered to the Charterers.
6 (b) Subject to Clause 10(b), the Charterers have the option to
7 extend the Charter Period in direct continuation for the period
8 stated in Box 10(i), but such an option must be declared in
9 accordance with Box 10(ii).
10 (c)The Charter Period shall automatically be extended for the time
11 required to complete the voyage or well (whichever is later) in Box
12 11(i) in progress, such time net to exceed the period stated in Box
13 11(ii).
14

**2. Delivery and Redelivery**

15
16 (a) *Delivery.* - Subject to sub-clause (b) of this Clause the Vessel
17 shall be delivered by the Owners free of cargo and with clean tanks
18 at any time between the date stated in Box 5 and the date stated in
19 Box 6 at the port or place stated in Box 7 where the Vessel can
20 safely lie always afloat.
21 (b) *Mobilication.* - (i) The Charterers shall pay a lump sum as
22 stated in Box 12 without discount by way of mobilisation charge in
23 consideration of the Owners giving delivery at the port or place
24 stated in Box 7. The mobilisation charge shall not be affected by
25 any change in the port or place of mobilisation from that stated in
26 Box 13.
27 (ii) Should the Owners agree to the Vessel loading and transporting
28 cargo and/or undertaking any other service for the Charterers en
29 route to the part of delivery or from the port of redelivery, then all
30 terms and conditions of this Charter Party shall apply to such
31 loading and transporting and/or other service exactly as if
32 performed during the Charter Period excepting only that any lump
33 sum freight agreed in respect thereof shall be payable on shipment
34 or commencement of the service as the case may be, the Vessel
35 and/or goods lost or not lost.
36 (c) *Cancelling.* - If the Vessel is not delivered by midnight local time
37 on the cancelling date stated in Box 6, the Charterers shall be
38 entitled to cancel this Charter Party. However, if despite the
39 exercise of due diligence by the Owners, the Owners will be unable
40 to deliver the Vessel by the cancelling date, they may give notice in
41 writing to the Charterers at any time prior to the delivery date as
42 stated in Box 5 and shall state in such notice the date by which
43 they will be able to deliver the Vessel. The Charterers may within
44 24 hours of receipt of such notice give notice in writing to the
45 Owners cancelling this Charter Party. If the Charterers do not give
46 such notice, then the later date specified in the Owners' notice
47 shall be substituted for the cancelling date for all the purposes of
48 this Charter Party. In the event the Charterers cancel the Charter
49 Party, it shall terminate on terms that neither party shall be liable to
50 the other for any losses incurred by reason of the non-delivery of
51 the Vessel or the cancellation of the Charter Party.
52 (d) *Redelivery.* - The Vessel shall be redelivered on the expiration
53 or earlier termination of this Charter Party free of cargo and with
54 clean tanks at the port or place as stated in Box 8(i) or such other
55 port or place as may be mutually agreed. The Charterers shall give
56 not less than the number of days notice in writing of their intention
57 to redeliver the Vessel, as stated in Box 8(ii).
58 (e) *Demobilisation.* - The Charterers shall pay a lump sum without
59 discount in the amount as stated in Box15 by way of demobilisation
60 charge which amount shall be paid on the expiration or earlier
61 termination of this Charter Party.
62

**3. Condition of Vessel**

63
64 (a) The Owners undertake that at the date of delivery of the
65 Charter Party the Vessel shall be of the description and
66 classification as specified in ANNEX "A", attached hereto, and
67 undertake to so maintain the Vessel during the period of service
68 under this Charter Party.
69 (b) The Owners shall before and at the date of delivery of the
70 Vessel and throughout the Charter Period exercise due diligence to
71 make and maintain the Vessel tight, staunch, strong in good order
72 and condition and, without prejudice to the generality of the
73 foregoing, in every way fit to operate effectively at all times for the
74 services as stated in Clause 5.
75
76
77 **4. Survey**

78 The Owners and the Charterers shall jointly appoint an
79 independent surveyor for the purpose of determining and
80 agreeing in writing, the condition of the Vessel, any anchor
81 handling and towing equipment specified in Section 5 of ANNEX
82 "A", and the quality and quantity of fuel, lubricants and water at
83 the time of delivery and redelivery hereunder. The Owners and
84 the Charterers shall jointly share the time and expense of such
85 surveys.
86

**5. Employment and Area of Operation**

87
88 (a) The Vessel shall be employed in offshore activities which are
89 lawful in accordance with the law of the place of the Vessel's flag
90 and/or registration and of the place of operation. Such activities
91 shall be restricted to the service(s) as stated in Box 18, and to
92 voyages between any good and safe port or place and any place
93 or offshore unit where the Vessel can safely lie always afloat
94 within the Area of Operation as stated in Box 17 which shall
95 always be within Institute Warranty Limits and which shall in no
96 circumstances be exceeded without prior agreement and
97 adjustment of the Hire and in accordance with such other terms
98 as appropriate to be agreed; provided always that the Charterers
99 do not warrant the safety of any such port or place or offshore unit
100 but shall exercise due diligence in issuing their orders to the
101 Vessel as if the Vessel were their own property and having regard
102 to her capabilities and the nature of her employment. Unless
103 otherwise agreed, the Vessel shall not be employed as a diving
104 platform.
105 (b) Relevant permission and licenses from responsible authorities
106 for the Vessel to enter, work in and leave the Area of Operation
107 shall be obtained by the Charterers and the Owners shall assist, if
108 necessary, in every way possible to secure such permission and
109 licenses.
110 (c) *The Vessel's Space.* - The whole reach and burden and decks
111 of the Vessel shall throughout the Charter Period be at the
112 Charterers' disposal reserving proper and sufficient space for the
113 Vessel's Master, Officers, Crew, tackle, apparel, furniture,
114 provisions and stores. The Charterers shall be entitled to carry, so
115 far as space is available and for their purposes in connection with
116 their operations:
117 (i) Persons other than crew members, other than fare paying,
118 and for such purposes to make use of the Vessel's available
119 accommodation not being used on the voyage by the Vessel's
120 Crew. The Owners shall provide suitable provisions and
121 requisites for such persons for which the Charterers shall pay
122 at the rate as stated in Box 26 per meal and at the rate as
123 stated in Box 27 per day for the provision of bedding and
124 services for persons using berth accommodation.
125 (ii) Lawful cargo whether carried on or under deck.
126 (iii) Explosives and dangerous cargo whether in bulk or
127 packaged, providing proper notification has been given and
128 such cargo is marked and carried in accordance with the
129 national regulations or the Vessel and/or the International
130 Maritime Dangerous Goods Code and/or other pertinent
131 regulations. Failing such proper notification, marking or packing
132 the Charterers shall indemnify the Owners in respect of any
133 loss, damage or liability whatsoever and howsoever arising
134 there from. The Charterers accept responsibility for any
135 additional expense (including reinstatement expenses)
136 incurred by the Owners in relation to the carriage of explosives
137 and dangerous cargo.
138 (iv) Hazardous and noxious substances, subject to Clause
139 7(d)(iv) proper notification and any pertinent regulations.
140 (d) *Lay-up of Vessel.* - The Charterers shall have the option of
141 laying up the Vessel at an agreed safe port or place for all or any
142 portion of the Charter Period in which case the Hire hereunder
143 shall continue to be paid but, if the period of such lay up exceeds
144 30 consecutive days there shall be credited against such Hire the
145 amount which the Owners shall reasonably have saved by way of
146 reduction in expenses and overheads as a result of the lay-up of
147 the Vessel.
148

**6. Master and Crew**

149
150 (a) (i) The Master shall carry out his duties promptly and the
151 Vessel shall render at reasonable services within her capabilities
152 by day and by night *(on the basis of 24 hours' operation)* and
153 at such times and on such schedules as the Charterers may
154 reasonably require without any obligations of the Charterers to

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

155 pay to the Owners or the Master, Officers or the Crew of the Vessel
156 any excess of overtime payments. The Charterers shall furnish the
157 Master with all instructions and sailing directions and the Master
158 and Engineer shall keep full and correct logs accessible to the
159 Charterers or their agents.
160 (ii) The Master shall sign cargo documents as and in the form
161 presented; the same, however, not to be Bills of Lading, but
162 receipts which shall be non-negotiable documents and shall be
163 marked as such. The Charterers shall indemnify the Owners
164 against all consequences and liabilities arising from the Master,
165 Officers or agents signing, under the direction of the Charterers,
166 those cargo documents or other documents inconsistent with this
167 Charter Party or from any irregularity in the papers supplied by the
168 Charterers or their agents.
169 (b) The Vessel's Crew if required by Charterers will connect and
170 disconnect electric cables, fuel, water and pneumatic hoses when
171 placed on board the Vessel in port as well as alongside the
172 offshore units; will operate the machinery on board the Vessel for
173 loading and unloading cargoes; and will hook and unhook cargo on
174 board the Vessel when loading or discharging alongside offshore
175 units. If the port regulations or the seamen and/or labor unions do
176 not permit the Crew of the Vessel to carry out any of this work, then
177 the Charterers shall make, at their own expense, whatever other
178 arrangements may be necessary, always under the direction of the
179 Master.
180 (c) If the Charterers have reason to be dissatisfied with the conduct
181 of the Master or any Officer or member of the Crew, the Owners on
182 receiving particulars of the complaint shall promptly investigate the
183 matter and if the complaint proves to be well founded, the Owners
184 shall as soon as reasonably possible make appropriate changes in
185 the appointment.
186 (d) The entire operation, navigation, and management of the
187 Vessel shall be in the exclusive control and command of the
188 Owners, their Master, Officers and The Vessel will be operated and
189 the services hereunder will be rendered as requested by the
190 Charterers, subject always to the exclusive right of the Owners or
191 the Master of the Vessel to determine whether operation of the
192 Vessel may be safely undertaken. In the performance of the
193 Charter Party, the Owners are deemed to be an independent
194 contractor, the Charterers being concerned only with the results of
195 the services performed.
196
197 **7. Owners to Provide**
198 (a) The Owners shall provide and pay for all provisions, wages and
199 all other expenses of the Master, Officers and Crew; all
200 maintenance and repair of the Vessel's hull, machinery and
201 equipment as specified in ANNEX "A"; also, except as otherwise
202 provided in this Charter Party, for all insurance on the Vessel, all
203 dues and charges directly related to the Vessel's flag and/or
204 registration, all deck, cabin and engine room stores, cordage
205 required for ordinary ship's purposes mooring alongside in harbour,
206 and all fumigation expenses and de-ratisation certificates. The
207 Owners' obligations under this Clause extend to cover all liabilities
208 for consular charges appertaining to the Master, Officers and Crew,
209 customs or import duties arising at any time during the
210 performance of this Charter Party in relation to the personal effects
211 of the Master, Officers and Crew; and in relation to the stores,
212 provisions, *spares, equipment* and other matters as aforesaid
213 which the Owners are to provide and/or pay for and the Owners
214 shall refund to the Charterers any sums they or their agents may
215 have paid or be been compelled to pay in respect of such liability.
216 (b) On delivery the Vessel shall be equipped, if appropriate, at the
217 Owners' expense with any towing ~~and anchor-handling equipment~~
218 specified in Section 5(b) of ANNEX "A". If during the Charter Period
219 any such equipment becomes lost, damaged or unserviceable,
220 other than as a result of the Owners' negligence, the Charterers
221 shall either provide, or direct the Owners to provide, an equivalent
222 replacement at the Charterers' expense.
223
224 **8. Charterers to Provide**
225 (a) While the Vessel is on hire the Charterers shall provide and pay
226 for all fuel, lubricants, water, dispersants, firefighting foam and
227 transport thereof, port charges, pilotage and boatmen and canal
228 steersmen (whether compulsory or not), launch hire (unless
229 incurred in connection with the Owners' business), light dues, tug
230 assistance, canal, dock, harbour, tonnage and other dues and
231 charges, agencies and commissions incurred on the Charterers'
232 business, costs for security or other watchmen, and of quarantine

233 (if occasioned by the nature of the cargo carried or the ports
234 visited whilst employed under this Charter Party but not
235 otherwise).
236 (b) At all times the Charterers shall provide and pay for the
237 loading and unloading of cargoes so far as not done by the
238 Vessel's crew, cleaning of cargo tanks, all necessary dunnage,
239 uprights and shoring equipment for securing deck cargo, all
240 cordage except as to be provided by the Owners, all ropes slings
241 and special runners (including bulk cargo discharge hoses)
242 actually used for loading and discharging, inert gas required for
243 the protection of cargo, and electrodes used for offshore works,
244 and shall reimburse the Owners for the actual cost of replacement
245 of special mooring lines to offshore units, wires, nylon spring lines
246 etc. used for offshore works, all hose connections and adapters,
247 and further, shall refill oxygen/acetylene bottles used for offshore
248 works.
249 (c) The Charterers shall pay for customs duties, all permits,
250 import duties (including costs involved in establishing temporary
251 or permanent importation bonds), and clearance expenses, both
252 for the Vessel and/or equipment, required for or arising out of *the*
253 *charterers' operation*.
254
255 **9. Bunkers**
256 Unless otherwise agreed, the Vessel shall be delivered with
257 bunkers and lubricants as on board and redelivered with sufficient
258 bunkers to reach the next bunkering stage en route to her next
259 port of call. The Charterers upon delivery and the Owners upon
260 redelivery shall take over and pay for the bunkers and lubricants
261 on board at the prices prevailing at the times and ports of delivery
262 and redelivery.
263
264 **10. Hire and Payments**
265 (a) *Hire.* - The Charterers shall pay Hire for the Vessel at the rate
266 stated in Box 19 per day or pro rata far part thereof from the time
267 that the Vessel is delivered to the Charterers until the expiration
268 or earlier termination of this Charter Party.
269 (b) *Extension Hire.* - If the option to extend the Charter Period
270 under Clause 1(b) is exercised, Hire for such extension shall,
271 unless stated in Box 20, be mutually agreed between the Owners
272 and the Charterers.
273 (c) *Adjustment of Hire.* - The rate of hire shall be adjusted to
274 reflect documented changes, after the date of entering into the
275 Charter Party or the date of commencement of employment,
276 whichever is earlier. In the Owners' costs arising from changes in
277 the Charterers' requirements or regulations governing the Vessel
278 and/or its Crew or this Charter Party.
279 (d) *Invoicing.* - All invoices shall be issued in the contract currency
280 stated in Box 18. In respect of reimbursable expenses incurred in
281 currencies other than the contract currency, the rate of exchange
282 into the contract currency shall be that quoted by the Central
283 Bank of the country of such other currency as at the date of the
284 Owners' invoice. Invoices covering Hire and any other payments
285 due shall be issued monthly as stated in Box 21(i) or at the
286 expiration or earlier termination of this Charter Party.
287 Notwithstanding the foregoing, bunkers and lubricants on board at
288 delivery shall be invoiced at the time of delivery.
289 (e) *Payments.* - Payments of Hire, bunker invoices and
290 disbursements for the Charterers' account shall be received
291 within the number of days stated in Box 23 from the date of
292 receipt of the invoice. Payment shall be made in the contract
293 currency in full without discount to the account stated in Box 22.
294 However any advances for disbursements made on behalf of and
295 approved by the Owners may be deducted from Hire due.
296 If payment is not received by the Owners within 5 banking days
297 following the due date the Owners are entitled to charge interest
298 at the rate stated in Box 24 on the amount outstanding from and
299 including the due date until payment is received.
300 Where an invoice is disputed, the Charterers shall in any event
301 pay the undisputed portion of the invoice but shall be entitled to
302 withhold payment of the disputed portion provided that such
303 portion is reasonably disputed and the Charterers specify such
304 reason. Interest will be chargeable at the rate stated in Box 24 on
305 such disputed amounts where resolved in favour of the Owners.
306 Should the Owners prove the validity
307 of the disputed portion of the invoice, balance payment shall be
308 received by the Owners within 5 banking days after the dispute is
309 resolved. Should the Charterers' claim be valid, a corrected
310 invoice shall be issued by the Owners.

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

In default of payment as herein specified, the Owners may require the Charterers to make payment of the amount due within 5 banking days of receipt of notification from the Owners; failing which the Owners shall have the right to withdraw the Vessel without prejudice to any claim the Owners may have against the Charterers under this Charter Party.

While payment remains due the Owners shall be entitled to suspend the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequence thereof, in respect of which the Charterers hereby indemnify the Owners, and hire shall continue to accrue and any extra expenses resulting from such suspension shall be for the Charterers' account.

~~10. Audit - The Charterers shall have the right to appoint an independent chartered accountant to audit the Owners' books directly related to work performed under this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 26, to determine the validity of the Owners' charges hereunder. The Owners undertake to make their records available for such purposes at their principal place of business during normal working hours. Any discrepancies discovered in payments made shall be promptly received by invoice of credit as appropriate.~~

**11. Suspension of Hire**
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accidents to the Vessel, the Vessel is prevented from working, no Hire shall be payable in respect of any time lost and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:
(i) the carriage of cargo as noted in Clause 5(c)(iii) and (iv),
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel without the consent or the instructions of the Charterers;
(iii) deviation from her Charter Party duties or exposure to abnormal risks at the request of the Charterers;
(iv) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;
(v) detention or damage by ice;
(vi) any act or omission of the Charterers, their servants or agents.
(b) *Liability for Vessel not Working.* - The Owners' liability for any loss, damage or delay sustained as a result of the Vessel being prevented from working by any cause whatsoever shall be limited to suspension of hire
(c) *Maintenance and Drydocking.* - Notwithstanding sub-clause (a) hereof, the Charterers shall grant the Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter Period for maintenance and repairs including drydocking (hereinafter referred to as "maintenance allowance").
The Vessel shall be drydocked at regular intervals. The Charterers shall place the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated by the Owners at a later date) having facilities suitable to the Owners for the purpose of such drydocking. During reasonable voyage time taken in transits between such port and Area of Operation the Vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance.
Hire shall be suspended during any time taken in maintenance repairs and drydocking in excess of the accumulated maintenance allowance.
In the event of less time being taken by the Owners for repairs and drydocking or, alternatively, the Charterers not making the Vessel available for all or part of this time, the Charterers shall, upon expiration or earlier termination of the Charter Party, pay the equivalent of the daily rate of Hire then prevailing in addition to Hire otherwise due under this Charter Party in respect of all such time not so taken or made available.
Upon commencement of the Charter Period, the Owners agree to furnish the Charterers with the Owners' proposed drydocking schedule and the Charterers agree to make every reasonable effort to assist the Owners in adhering to such predetermined drydocking schedule for the Vessel.

**12. Liabilities and Indemnities**
(a) *Owners.* - Notwithstanding anything else contained in this Charter Party excepting Clauses 5(c)(iii), 7(b), 8(b), 12(g), 15(c) and 21, the Charterers shall not be responsible for loss of or damage to the property of the Owners or of their contractors and sub-contractors, including the Vessel, or for personal injury or death of the employees of the Owners or of their contractors and sub-contractors, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, injury or death is caused wholly or partially by the act, neglect, or default of the Charterers, their employees, contractors or sub-contractors, and even if such loss, damage, injury or death is caused wholly or partially by unseaworthiness of any vessel; and the Owners shall indemnify, protect, defend and hold harmless the Charterers from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury or death.
(b) *Charterers.* - Notwithstanding anything else contained in this Charter Party excepting Clause 21, the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors, including their offshore units, or for personal injury or death of the employees of the Charterers or of their contractors and sub-contractors (either than the Owners and their contractors and sub-contractors) or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel; and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death.
(c) *Consequential Damages.* -Neither party shall be liable to the other for, and each party hereby agrees to protect, defend and indemnify the other against, any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter Party, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance
(d) *Limitations.* - Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party.
(e) *Himalaya Clause.* - (i) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sub-contractors, clients, joint venturers and joint interest owners (always with respect to the job or project on which the Vessel is employed); their respective employees and their respective underwriters.
(ii) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies, the Owners' sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator,

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

466 its demise charterer(s), their respective employees and their
467 respective underwriters.
468 (iii) The Owners or the Charterers shall be deemed to be acting as
469 agent or trustee of and for the benefit of all such persons and
470 parties set forth above, but only for the limited purpose of
471 contracting for the extension of such benefits to such persons and
472 parties.
473 (f) *Mutual Waiver of Recourse (Optional, only applicable if stated in*
474 *Box 28, but regardless of whether this option is exercised the other*
475 *provisions of Clause 12 shall apply and shall be paramount)*In
476 order to avoid disputes regarding liability for personal injury or
477 death of employees or for loss of or damage to property, the
478 Owners and the Charterers have entered into, or by this Charter
479 Party agree to enter into, an Agreement for Mutual Indemnity and
480 Waiver of Recourse (in a form substantially similar to that specified
481 in ANNEX "C") between the Owners, the Charterers and the
482 various contractors and sub-contractors of the Charterers.
483 (g) *Hazardous and Noxious Substances.* - Notwithstanding any
484 other provision of this Charter Party to the contrary, the Charterers
485 shall always be responsible for any losses, damages or liabilities
486 suffered by the Owners, their employees, contractors or sub-
487 contractors, by the Charterers, or by third parties, with respect to
488 the Vessel or other property, personal injury or death, pollution or
489 otherwise, which losses, damages or liabilities are caused, directly
490 or indirectly, as a result of the Vessel's carriage of any hazardous
491 and noxious substances in whatever form as ordered by the
492 Charterers, and the Charterers shall defend, indemnify the Owners
493 and hold the Owners harmless for any expense, loss or liability
494 whatsoever or howsoever arising with respect to the carriage of
495 hazardous or noxious substances.

## 13. Pollution

497 (a) Except as otherwise provided for in Clause 15(c)(iii), the
498 Owners shall be liable for and agree to indemnify, defend and hold
499 harmless the Charterers against, all claims, costs, expenses,
500 actions, proceedings, suits, demands and liabilities whatsoever
501 arising out of actual or potential pollution damage and the cost of
502 cleanup or control thereof arising from acts or omissions of the
503 Owners or their personnel which cause or allow discharge, spills or
504 leaks from the vessel, except as may emanate from cargo thereon
505 or therein.
506 (b) The Charterers shall be liable for and agree to indemnify,
507 defend and hold harmless the Owners from all claims, costs,
508 expenses, actions, proceedings, suits, demands,
509 liabilities, loss or damage whatsoever arising out of or resulting
510 from any either actual or potential pollution damage, even where
511 caused wholly or partially by the act, neglect or default of the
512 Owners, their employees, contractors or sub-contractors or by the
513 unseaworthiness of the Vessel.

## 14. Insurance

516 (a)(i) The Owners shall procure and maintain in effect for the
517 duration of this Charter Party, with reputable insurers, the
518 insurances set forth in ANNEX "B". Policy limits shall not be less
519 than those indicated. Reasonable deductibles are acceptable and
520 shall be for the account of the Owners.
521 (ii) The Charterers shall upon request be named as co-insured.
522 The Owners shall upon request cause insurers to waive
523 subrogation rights against the Charterers (as encompassed in
524 Clause 12(e)(i)). Co-insurance and/or waivers of subrogation shall
525 be given only insofar as these relate to liabilities which are properly
526 the responsibility of the Owners under the terms of this Charter
527 Party.
528 (b) The Owners shall upon request furnish the Charterers with
529 certificates of insurance which provide sufficient information to
530 verify that the Owners have complied with the insurance
531 requirements of this Charter Party.
532 (c) If the Owners fail to comply with the aforesaid insurance
533 requirements, the Charterers may, without prejudice to any other
534 rights or remedies under this Charter Party, purchase similar
535 coverage and deduct the cost thereof from any payment due to the
536 Owners under this Charter Party.

## 15. Saving of Life and Salvage

539 (a) The Vessel shall be permitted to deviate for the purpose of
540 saving life at sea without prior approval of or notice to the
541 Charterers and without loss of Hire provided however that notice of
542 such deviation is given as soon as possible.

543 (b) Subject to the Charterers' consent, which shall not be
544 unreasonably withheld, the Vessel shall be at liberty to undertake
545 attempts at salvage, it being understood that the Vessel shall be
546 off hire from the time she leaves port or commences to deviate
547 and sha shall remain off-hire until she is again in every way ready
548 to resume the Charterers' service at a position which is not less
549 favourable to the Charterers than the position at the time of
550 leaving port or deviating for the salvage service.
551 All salvage monies earned by the Vessel shall be divided equally
552 between the Owners and the Charterers, after deducting the
553 Master's, Officers' and Crew's share, legal expenses, value of fuel
554 and lubricants consumed, Hire of the Vessel lost by the Owners
555 during the salvage, repairs to damage sustained, if any, and any
556 other extraordinary loss or expense sustained as a result of the
557 salvage.
558 The Charterers shall be bound by all measures taken by the
559 Owners in order to secure payment of salvage and to fix its
560 amount.
561 (c) The Owners shall waive their right to claim any award for
562 salvage performed on property owned by or contracted to the
563 Charterers, always provided such property was the object of the
564 operation the Vessel was chartered for, and the Vessel shall
565 remain on hire when rendering salvage services to such property.
566 This waiver is without prejudice to any right the Vessel's Master,
567 Officers and Crew may have under any tide.
568 If the Owners render assistance to such property in distress on
569 the basis of "no claim for salvage", then, notwithstanding any
570 other provisions contained in this Charter Party and even in the
571 event of neglect or default of the Owners, Master, Officers or
572 Crew:
573 (i) The Charterers shall be responsible for and shall indemnify
574 the Owners against payments made, under any legal rights, to
575 the Master, Officers and Crew in relation to such assistance.
576 (ii) The Charterers shall be responsible for and shall reimburse
577 the Owners for any loss or damage sustained by the Vessel or
578 her equipment by reason of giving such assistance and shall
579 also pay the Owners' additional expenses thereby incurred.
580 (iii) The Charterers shall be responsible for any actual or
581 potential spill, seepage and/or emission of any pollutant
582 howsoever caused occurring within the offshore site and any
583 pollution resulting therefrom wheresoever it may occur and
584 including but not limited to the cost of such measures as are
585 reasonably necessary to prevent or mitigate pollution damage,
586 and the Charterers shall indemnify the Owners against any
587 liability, cost or expense arising by reason of such actual or
588 potential spill, seepage and/or emission.
589 (iv) The Vessel shall not be off-hire as a consequence of giving
590 such assistance, or effecting repairs under sub-paragraph (ii)
591 of this sub-clause, and time taken for such repairs shall not
592 count against time granted under Clause 11(c).
593 (v) The Charterers shall indemnify the Owners against any
594 liability, cost and/or expense whatsoever in respect of any loss
595 of life, injury, damage or other loss to person or property
596 howsoever arising from such assistance.

## 16. Lien

599 The Owners shall have a lien upon all cargoes *(other than*
600 *property owned by the charterers' client and subcontractors)*
601 for all claims against the Charterers under this Charter Party and
602 the Charterers shall have a lien on the Vessel for all monies paid
603 in advance and not earned. The Charterers will not suffer, nor
604 permit to be continued, any lien or encumbrance incurred by them
605 or their agents, which might have priority over the title and interest
606 of the Owners in the Vessel. Except as provided in Clause 12, the
607 Charterers shall indemnify and hold the Owners harmless against
608 any lien of whatsoever nature arising upon the Vessel during the
609 Charter Period while she is under the control of the Charterers,
610 and against any claims against the Owners arising out of the
611 operation of the Vessel by the Charterers or out of any neglect of
612 the Charterers in relation to the Vessel or the operation thereof.
613 Should the Vessel be arrested by reason of claims or liens arising
614 out of her operation hereunder, unless brought about by the act or
615 neglect of the Owners, the Charterers shall at their own expense
616 take all reasonable steps to secure that within a reasonable time
617 the Vessel is released and at their own expense put up bail to
618 secure release of the Vessel.

## 17. Sublet and Assignment

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In case of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.



(a) *Charterers*. - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel.

(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers.

(c) *Owners*. - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of that part of the services which is sublet or assigned.

**18. Substitute Vessel**

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel subject to the Charterers' prior approval which shall not be unreasonably withheld.

**19. War**

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers.

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks.

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war (whether there be a declaration of

war or not) either the Owners or the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART I if it has cargo on board after discharge thereof at destination or, if deferred under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if the Vessel has no cargo on board, at the port or place at which it then is or if at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery.

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed a deviation.

The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause.

**20. Excluded Ports**

(a) The Vessel shall not be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel; (b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged he has liberty to sail to a convenient open place and await the Charterers' fresh instructions.

(b) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand.

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

**21. General Average and New Jason Clause**

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

**22. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In case of modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

777 owners of any goods carried under this Charter Party paid or
778 payable by the either or non-carrying ship or her owners to the
779 owners of the said goods and set-off, recouped or recovered by the
780 other or non-carrying ship or her owners as part of their claim
781 against the Vessel or the Owners. The foregoing provisions shall
782 also apply where the owners, operators or those in charge of any
783 ship or ships or objects other than or in addition to the colliding
784 ships or objects are at fault in respect of a collision or contact

785
786 **23. Structural Alterations and Additional Equipment**
787 The Charterers shall have the option of, at their expense, making
788 structural alterations to the Vessel or installing additional
789 equipment with the written consent of the Owners which shall not
790 be unreasonably withheld but unless otherwise agreed the Vessel
791 is to be redelivered reinstated, at the Charterers' expense to her
792 original condition. The Vessel is to remain on hire during any
793 period of these alterations or reinstatement. The Charterers, unless
794 otherwise agreed, shall be responsible for repair and maintenance
795 of any such alteration or additional equipment.

796
797 **24. Health and Safety**
798 The Owners shall comply with and adhere to all applicable
799 international, national and local regulations pertaining to health and
800 safety, and such Charterers' instructions as may be appended
801 hereto.

802
803 **25. Taxes**
804 Each party shall pay taxes due on its own profit, income and
805 personnel. The Charterers shall pay all other taxes and dues
806 arising out of the operation or use of the Vessel during the Charter
807 Period.
808 In the event of change in the Area of Operation or change in local
809 regulation and/or interpretation thereof, resulting in an unavoidable
810 and documented change of the Owners' tax liability after the date
811 of entering into this Charter Party or the date of commencement of
812 employment, whichever is the earlier, Hire shall be adjusted
813 accordingly.

814
815 **26. Early Termination**
816 (a) *For Charterers' Convenience.* - The Charterers may terminate
817 this Charter Party at any time by giving the Owners written notice
818 as stated in Box 15 and by paying the settlement stated in Box 14
819 and the demobilisation charge stated in Box 16, as well as Hire or
820 other payments due under the Charter Party.
821 (b) *For Cause.* - If either party becomes informed of the occurrence
822 of any event described in this Clause that party shall so notify the
823 other party promptly in writing and in any case within 3 days after
824 such information is received. If the occurrence has not ceased
825 within 3 days after such notification has been given, this Charter
826 Party may be terminated by either party, without prejudice to any
827 other rights which either party may have, under any of the following
828 circumstances:
829 (i) *Requisition.* - If the government of the state of registry and/or
830 the flag of the Vessel, or any agency thereof, requisitions for
831 hire or title or otherwise takes possession of the Vessel during
832 the Charter Period.
833 (ii) *Confiscation.* - If any government, individual or group, whether
834 or not purporting to act as a government or on behalf of any
835 government, confiscates, requisitions, expropriates, seizes or
836 otherwise takes possession of the Vessel during the Charter
837 Period.
838 (iii) *Bankruptcy.* - In the event of an order being made or
839 resolution passed for the winding up, dissolution, liquidation or
840 bankruptcy of either party (otherwise than for the purpose of
841 reconstruction or amalgamation) or if a receiver is appointed
842 or if it suspends payment or ceases to carry on business.
843 (iv) *Loss of Vessel.* - If the Vessel is lost, actually or
844 constructively, or missing, unless the Owners provide a
845 substitute vessel pursuant to Clause 16 in the case of
846 termination, Hire shall cease from the date the Vessel was
847 lost or, in the event of a constructive total loss, from the date
848 of the event giving rise to such loss. If the date of loss cannot
849 be ascertained of the Vessel is missing, payment of Hire shall
850 cease from the date the Vessel was last reported.
851 (v) *Breakdown.* - if, at any time during the term of this Charter
852 Party, a breakdown of the Owners' equipment or Vessel
853 results in the Owners being unable to perform their obligations
854 hereunder for a period exceeding that stated in Box 32,

855 unless the Owners provide a substitute vessel pursuant to
856 Clause 18.
857 (vi) *Force Majeure.* - If a force majeure condition as defined in
858 Clause 27 prevails for a period exceeding 15 consecutive
859 days.
860 (vii) *Default.* - If either party is in repudiatory breach of its
861 obligations hereunder. Termination as a result of any of the
862 above mentioned causes shall not relieve the Charterers of
863 any obligation for Hire and any other payments due. *If the*
864 *Owners default in the delivery of the vessel or during*
865 *the charter Period withdraw the vessel or terminate this*
866 *Charter Party without cause, notwithstanding any*
867 *provision to the contrary the charterers shall be entitled*
868 *to received from the Owners an amount equivalent to*
869 *the settlement stated in Box 14.*

870
871 **27. Force Majeure**
872 Neither the Owners nor the Charterers shall be liable for any loss,
873 damages or delay or failure in performance hereunder resulting
874 from any force majeure event, including but not limited to acts of
875 God, fire, action of the elements, epidemics, war (declared or
876 undeclared), warlike actions, insurrection, revolution or civil strife,
877 piracy, civil war or hostile action, strikes or differences with
878 workman (except for disputes relating solely to the Owners' or the
879 Charterers' employees), acts of the public enemy, federal or state
880 laws, rules and regulations of any governmental authorities
881 having or asserting jurisdiction in the premises or of any other
882 group, organisation or informal association (whether or not
883 formally recognised as a government), and any other cause
884 beyond the reasonable control of either party which makes
885 continuance of operations impossible.

886
887 **28. Notices and Invoices**
888 Notices and invoices required to be given under this Charter Party
889 shall be given in writing to the addresses stated in Boxes 21, 35
890 and 36 as appropriate.

891
892 **29. Wreck Removal**
893 If the Vessel sinks and becomes a wreck and an obstruction to
894 navigation and has to be removed upon request by any
895 compulsory law or authority having jurisdiction over the area
896 where the wreck is placed, the Owners shall be liable for any and
897 all expenses in connection with the raising, removal, destruction,
898 lighting or marking of the wreck.

899
900 **30. Confidentiality**
901 All information or data obtained by the Owners in the performance
902 of this Charter Party is the property of the Charterers, is
903 confidential and shall not be disclosed without the prior written
904 consent of the Charterers. The Owners shall use their best efforts
905 to ensure that the Owners, any of their sub-contractors, and
906 employees and agents thereof shall not disclose any such
907 information or data.

908
909 ~~**31. Law and Arbitration**~~
910 ~~(a) This Charter Party shall be governed by English law and~~
911 ~~any dispute arising out of this Charter Party shall be referred to~~
912 ~~arbitration in London, one arbitrator being appointed by each~~
913 ~~party in accordance with the Arbitration Acts 1950 and 1979 or~~
914 ~~any statutory modification or re-enactment thereof for the time~~
915 ~~being in force.~~
916 ~~On the receipt by one party of the nomination in writing of the~~
917 ~~other party's arbitrator that party shall appoint their arbitrator~~
918 ~~within 14 days, failing which the arbitrator already appointed shall~~
919 ~~act as sole arbitrator. If two arbitrators properly appointed shall~~
920 ~~not agree they shall appoint an umpire whose decision shall be~~
921 ~~final.~~
922 ~~(b) Should any dispute arise out of this Charter Party, the matter~~
923 ~~in dispute shall be referred to three persons at New York one to~~
924 ~~be appointed by each of the parties hereto, and the third by the~~
925 ~~two so chosen; their decision or that of any two of them shall be~~
926 ~~final and for purpose of enforcing any award, this agreement may~~
927 ~~be made a rule of the Court. The arbitrators shall be members of~~
928 ~~the Society of Maritime Arbitrators, Inc. of New York and the~~
929 ~~proceedings shall be conducted in accordance with the rules of~~
930 ~~the Society.~~

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

# PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

931 *) (c) Any dispute arising out of this Charter Party shall be referred to
932 arbitration at the place stated in Box 33 subject to the law and
933 procedures applicable there.
934 (d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause
935 shall apply. 764
936 *) (a), (b) and (c) are alternatives; state alternative agreed in Box 33
937
938 **32. Entire Agreement**
939 This is the entire agreement of the parties, which supersedes all
940 previous written or oral understandings and which may not be
941 modified except by a written amendment signed by both parties.
942
943 **33. Severability Clause**
944 If any portion of this Charter Party is held to be invalid or
945 unenforceable for any reason by a court or governmental authority
946 of competent jurisdiction, then such portion will be deemed to be
947 stricken and the remainder of this Charter Party shall continue in
948 full force and effect.
949
950 **34. Demise**
951 Nothing herein contained shall be construed as creating a demise
952 of the Vessel to the Charterers.

953
954 **35. Definitions**
955 "Well" is defined for the purposes of this Charter Party as the time
956 required to drill, test, complete and/or abandon a single borehole
957 including any sidetrack thereof. "Offshore unit" is defined for the
958 purposes of this Charter Party as any vessel, offshore installation,
959 structure and/or mobile unit used in offshore exploration,
960 construction, pipelaying or repair, exploitation or production.
961 "Offshore site" is defined for the purposes of this Charter Party as
962 the area within three nautical miles of an "offshore unit" from or to
963 which the Owners are requested to take their Vessel by the
964 Charterers.
965 "Employees" is defined for the purposes of this Charter Party as
966 employees, directors, officers, servants, agents or invitees.
967
968 **36. Headings**
969 The headings of this Charter Party are for identification only and
970 shall not be deemed to be part hereof or be taken into
971 consideration in the interpretation or construction of this Charter
972 Party.



This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

Consolidated Pipe Carriers

Annex A



# TUG: 2400 BHP MARINA HARMONY



## GENERAL PARTICULARS

| | |
|---|---|
| TYPE | : TWIN SCREW TUG |
| YEAR BUILT | : 2007 |
| PORT OF REGISTRY | : SINGAPORE |
| CALL SIGN | : 9V7267 |
| OFFICIAL NUMBER | : 393458 |
| FLAG | : SINGAPORE |
| CLASSIFICATION | : NK |
| GRT / NRT | : 248 / 75 |
| SPEED | : 12 KNOTS |
| BOLLARD PULL | : 30.03 TON |
| LENGTH | : 27.09 METRES |
| BREADTH | : 8.06 METRES |
| DEPTH | : 4.12 METRES |
| DRAFT | : 3.9 METRES |
| F.WATER CAPACITY | : 30 MT |
| F.O. CAPACITY | : 180 MT |
| F.O. CONSUMPTION | : 7.5 MT PER DAY |
| CREW ACCOMODATION | : 10 PERSONS |

## MACHINERY AND EQUIPMENTS

| | |
|---|---|
| PROPULSION | : TWIN SCEW FIXED PITCH |
| MAIN ENGINE | : CUMMINS KTA38-M2 |
| AUX. ENGINE | : CUMMINS 6BT 5.9 – D(M) |
| TOWING HOOK | : 25 TONS |
| TOWING HYDRAL. WINCH | : WITH 40 MM X 750 M WIRE ROPE |

"Particulars given are entirely without warranty as to correctness and interested parties must satisfy themselves by inspection of ship's certificate or by other means of the vessel specification referred to.






### Code Name: "SUPPLYTIME 89" – dated 03 January 2009
### VESSEL SPECIFICATION (As Per Attachment)

**1. General**

(a) Owner    Name: _____

               Address: _____

(b) Operator    Name: _____

               Address: _____

(c) Vessel's Name: _____  Builder: _____

(d) Year Built: _____

(e) Type: _____

(f) Classification and Society: _____

(g) Flag:  Singapore

(h) Date of next scheduled drydocking: _____

**2. Performance:**

(a) Certified Bollard Pull (Tonnes): _____

(b) Speed/Consumption (Non-Towing):

    <u>(Approx. Daily Fuel Consumption)</u>
    (Fair weather)

| | | |
|---|---|---|
| Max Speed: | Kts.(app) | Tonnes |
| Service Speed: | Kts.(app) | Tonnes |
| Standby (main engines secured): | | Tonnes |

(c) Approx. Towing/Working Fuel Consumption

    Engine Power    100%    Tonnes

(d) Type(s) and Grade(s) of Fuel Used: _____

**3. Dimensions and Capacities/Discharge Rates:**

(a) L.O.A (m): ____  Breath(m): ____  Depth(m): ____

    Max Draught (m): _____

(b) Deadweight (metric tons): _____

| | Discharge Rate | |
|---|---|---|
| (c) *Cargo fuel max (m³): | /hr at | head |
| (d) *Drill Water max (m³): | /hr ot | head |
| (e) Portable Water (m³): | /hr at | head |
| (f) Dry Bulk (m³/cu.ft):  In Tanks | /hr at | head |
| (g) Liquid Mud (m³/barrels): | /hr at | head |

    (max. SG):
    State type of recirculation system i.e
    mechanical agitation, centrifugal pumps ecc.  _____

(h) Cargo Deck Area (m²): ____  Capacity (m.t.) ____

    Length (m) x Breath (m): _____

    Load Bearing Capacity: _____

(i) Heavy Weight Brine (m³/barrels):

    (max SG)  _____ /hr at ____ head

    * Multipurpose Tanks yes/no: _____

**4. Machinery**

(a) BHP Main Engines: _____

(b) Engine Builder: _____

(c) Number of engines and Type: _____

(d) Generators: _____

(e) Stabilisers: _____

(f) Bow Thruster(s): _____

(g) Stern Thruster(s): _____

(h) Propellers/Rudders: _____

(i) Number and Pressure Rating of Bulk Compressors: _____

(j) Fuel Oil Metering System: _____

**5. Towing and Anchor Handling Equipment**

(a)(i) Stern Roller (Dimensions): _____

    (ii) Anchor Handling/Towing Winch: _____

(iii) Rig Chain Locker Capacity (Linear feet of 3 in. Chain): _____

(iv) Tugger Winches: _____

(v) Chain Stopper Make and type: _____

(b)(i) Towing Wire: _____

(ii) Spare Towing Wire: _____

(iii) Work Wire: _____

(iv) (Spare Work Wire: _____

(v) Other Anchor Handling Equipment: _____

    (e.g Pelican Hooks, Shackles, Stretchers etc): _____

**6. Radio and Navigation Equipment:**

(a) Radio

    Single Side Band: _____

    VHF: _____

    Satcom: _____

(b) Electronic Navigation Equipment: _____

(c) Gyro: _____

(d) Radar: _____

(e) Autopilot: _____

(f) Depth Sounder: _____

*(continued)*

## ANNEX "A"

## VESSEL SPECIFICATION

7.  **Fire Fighting Equipment**

    (a) Class (FF1, FF2, FF3, other): _____

    (b) Fixed: _____

    (c) Portable: _____

8.  **Accommodation**

    (a) Crew _____ (b) Passengers _____

9.  **Galley**

    (a) Freezer Space (m³): _____

    (b) Cooler (m³): _____

10.  **Additional Equipment:**

    (a) Mooring Equipment: _____

    (b) Joystick: _____

    (c) Other: _____

11.  **Standby/Survivor Certificate**    Yes/No

    Nos : _____



## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

*Marine Hull Insurance.* - Hull and Machinery insurance shall be provided with limits
equal to those normally carried by the Owners for the vessel the value of the Vessel.

*Protection and indemnity (Marine Liability) Insurance.* -
Protection and indemnity or Marine Liability Insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or US $5 million, whichever is greater and shall include but not be limited to coverage for crew liability, third party bodily injury, towers liability (unless carried elsewhere).

~~*General Third party Liability Insurance.*~~
~~Coverage shall be for:~~
~~Bodily Injury:~~ ............................................ ~~per person~~
~~Property Damage:~~ _____ ~~per occurrence~~

~~*Workmen's Compensation and Employer's Liability Insurance for Employees.*~~
~~Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.~~

~~*Comprehensive General Automobile Liability Insurance*~~
~~Covering all owned, hired and non-owned vehicles, coverage shall be for:~~
~~Bodily Injury~~ _____ ~~According to the local law.~~
~~single limit per occurrence~~

~~Such other insurances as may be agreed~~



## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE
*(Optional, only applicable if stated in Box 28 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

Certain of such other contractors have signed, or may sign, counterparts s f this Agreement or substantially similar agreements relating to the Operations ("Signatory" or collectively "Signatories"); and

The Signatories wish to modify their relationship at common law and avoid unlrely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

The Owners shall hold harmless, defend, indemnity and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against, any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the

The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.





# ADDENDUM 1

IN ADDITION TO THE CHARTER PARTY "SUPPLYTIME 89" DATED 17TH AUGUST 2007 BETWEEN OWNERS CONSOLIDATED PIPE CARRIERS PTE LTD. AND CHARTERERS TRIDENT AUSTRALASIA FZE FOR THE CHARTER OF TUG "MARINA HARMONY" OR "MLC NANCY 6".

A.   Owner shall rectify points identified as recommendations in Charterer-appointed marine warranty survey inspection report, to the satisfaction of marine warranty surveyor, prior the handover of the vessel to Charterer at their time and cost.





**ADDENDUM No. 2 TO THE "SUPPLYTIME 89" CHARTER PARTY , DATED 3rd January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "MARINA HARMONY"**

**THIS ADDENDUM** made effective from 17th February 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF MARINA HARMONY, shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

## Charter party Period

1.) The Firm period of the Charter of the Marina Harmony is hereby extended from the 13th of January, 2009 until the 5th March, 2009, in direct continuation of its present Charter at the same Rate and Terms and Conditions as contained in the Main Charter Party and its Addenda.


CONSOLIDATED PIPECARRIERS PTE LTD.          TRIDENT AUSTRALASIA

**ADDENDUM No. 3 TO THE "SUPPLYTIME 89" CHARTER PARTY , DATED 3rd January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "MARINA HARMONY"**

**THIS ADDENDUM** made effective from 3rd of March 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF MARINA HARMONY, shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

**Charter party Period**

1.) The Firm period of the Charter of the Marina Harmony is hereby extended from the 3rd of march, 2009 until the 19th March, 2009, in direct continuation of its present Charter at the same Rate and Terms and Conditions as contained in the Main Charter Party and Its Addenda.


CONSOLIDATED PIPECARRIERS PTE LTD.          TRIDENT AUSTRALASIA

# EXHIBIT 2

# EXHIBIT 3

**Consolidated Pipe Carriers Pte Ltd**
152 Beach Road #12-03
Gateway East
189721
Singapore

| | | | | |
|---|---|---|---|---|
| CUSTOMER NO: | TRIDENTUSD | CUSTOMER NO.: | TRIDENTUSD |
| PAGE: | 1 | PAGE: | 1 |
| DATE: | 31/07/2009 | DATE: | 31/07/2009 |

SOLD
TO:

TRIDENT AUSTRALASIA FZE
P.O.Box 122319
Sail Zone, Sharjah
United Arab Emirates

REMIT TO ADDRESS:

Vessel : Marina Harmony

| DOCUMENT | DOC.DATE. | TY. | REFERENCE/APPLIED NUMBER | DUE DATE | AMOUNT | PAID | BALANCE |
|---|---|---|---|---|---|---|---|
| 01/QG34/001/2009 | 21/01/2009 | IN | Hire from 17 Jan 09 to 31 Jan 09 - Marina Harmony | 21/01/2009 | 116,878.62 | | 116,878.62 |
| 02/QG34/003/09 | 02/02/2009 | IN | Hire from 1 Feb 09 to 28 Feb 09 - Marina Harmony | 02/02/2009 | 112,000.00 | | 228,878.62 |
| 03/QG34/007/09 | 02/03/2009 | IN | Hire from 1 Mar 09 to 31 Mar 09 - Marina Harmony | 02/03/2009 | 96,608.53 | 96,608.53 | 228,878.62 |
| 04/QG34/008/09 | 06/04/2009 | IN | Hire from 1 Apr 09 to 4 Apr 09 - Marina Harmony | 06/04/2009 | 18,284.07 | | 247,162.69 |
| CPC-DN09-055 | 28/04/2009 | DN | Charge Back on Expense Made by CPC on Behalf | 28/04/2009 | 5,032.95 | | 252,195.64 |
| CPC/0901 | 15/04/2009 | IN | Food Provisions Supplied | 15/04/2009 | 805.58 | | 251,390.06 |
| | | | **Total Principal** | | | | **251,390.06** |
| | 31/07/2009 | | Interest for Invoice 01/QG34/001/2009 till 31st Jul 09 | | 7,339.34 | | 7,339.34 |
| | 31/07/2009 | | Interest for Invoice 02/QG34/003/09 till 31st Jul 09 | | 6,591.12 | | 13,930.46 |
| | 31/07/2009 | | Interest for Invoice 04/QG34/008/09 till 31st Jul 09 | | 697.30 | | 14,627.76 |
| | 31/07/2009 | | Interest for Debit Note CPC-DN09-055 till 31st Jul 09 | | 155.54 | | 14,783.30 |
| | | | **Total Interest** | | | | **14,783.30** |
| | | | **Total Principal and Interest** | | | | **266,173.36** |
| | | | **Daily Interest Rate** | | | | **82.91** |

Invoice reflected at paid column has been paid by Jonoob Tabisat Co

Thank you for keeping your account current

| | | |
|---|---|---|
| Credit Limit: | 0.00 |
| Credit Available: | 0.00 |
| **Total** | **266,173.36** |

TO ENSURE PROPER CREDIT, PLEASE CHECK
THE ITEMS YOU ARE PAYING IN THE ✓
COLUMN.

| **Total** | **266,173.36** |
|---|---|

**Consolidated Pipe Carriers Pte Ltd**

| IN - Invoice | PY - Applied Receipt | UC - Unapplied Cash |
|---|---|---|
| DB - Debit Note | ED - Earned Discount | RF - Refund |
| CR - Credit Note | AD - Adjustment | |
| T - Transit Payable | P - Prepayment | |

| 1 - 30 DAYS O/DUE | 31 - 60 DAYS O/DUE | 61 - 90 DAYS O/DUE | OVER 90 DAYS O/DUE |
|---|---|---|---|
| 14,783.30 | 0.00 | 0.00 | 251,390.06 |



# EXHIBIT 4

| 1. Shipbroker | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO) STANDARD BARGE BAREBOAT CHARTER PARTY CODE NAME: "BARGEHIRE 94" PART I |
|---|---|
| **Not Applicable** | |
| | 2. Place and Date |
| | **Singapore, 3 January 2009** |
| 3. Owners/Place of business (Cl.2) | 4. Charterers/Place of business (Cl.2) |
| **CONSOLIDATED PIPE CARRIERS PTE LTD** | **TRIDENT AUSTRALASIA FZE** |
| 162 Beach Road #12-03 Gateway East Singapore 189721 | P.O. Box 122319 SAIF Zone, Sharjah United Arab Emirates |
| Tel: (65) 6341 7887 Fax: (65) 6341 7666 | Tel: (61) 9 92252138 Fax:(61) 6 92262120 |

| 5. Barge's name, Call Sign and Flag (Cl. 1 & 13(c)) |
|---|
| **CPC 2806** |

| 6. Type of Barge | 7. GT/NT |
|---|---|
| **Flat Top Barge** | **2851 / 856** |
| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
| **2006 /Indonesia** | **Approximate 6600 MTons** |
| 10. Class (Cl. 13(a)) | 11. Date of last special survey by the Barge's classification society |
| **Germanischer Lloyd** | **Not Applicable** |

| 12. Further particulars or Barge |
|---|
| **As per Spec attachded.** |

| 13. Charter Party period (Cl. 2) | 14. Port or Place of delivery (Cl. 3) |
|---|---|
| **20 days firm, 20 daily options upon, further option upon mutual agreement** | **U.A.E. Hamriyah Free Zone** |
| 15. Port or Place of redelivery (Cl. 20) | 16. Mobilisation/Demobilisation Fee (Currency and method of payment, when and where payable) (Cl. 4) |
| **U.A.E. Hamriyah Free Zone** | **Not Applicable** |
| 17. Initial delivery period (Cl. 6(a)) | |
| **Between 5th and 12th of January 2009 ~~(ref to entire report)~~ by mutual agreement** | |
| 18. Delivery period notification schedule (Cl. 6(b)) | 19. Daily compensation for late delivery (Cl. 7 (e)) |
| | **Not Applicable** |
| Number of days' notice          Delivery Period | 20. Compensation for late delivery (state lumpsum) (Cl. 7 and Cl. 20) |
| **Four (4) days          Final delivery date** | **Not Applicable** |
| | 21. State amount per day per ballast engineer (Cl. 14) |
| | **Not Applicable** |
| | 22. Ballast engineer overtime expenses (state amount per hour per ballast engineer) (Cl. 14) |
| | **Net Applicable** |
| **Delivery Date: 5 to 12 January 2009** | |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen, 1994

(continued)

| | |
|---|---|
| 23. Trading limits (Cl. 8)<br><br>**Arabian Gulf** | |
| 24. Charter hire (Cl. 15(a))<br>**USD 2,200.00 per day** | 25. Rate of interest per annum applicable acc. to Cl. 15 (f)<br><br>**One percent (1%) per month** |
| 26. Currency and method of payment (Cl. 15(b))<br><br>**United State Dollar (USD)**<br><br>**Upon receipt of Invoice** | 27. Place of payment, also state beneficiary and bank account (Cl. 15(b))<br><br>**As per Invoice Instruction** |
| 28. Bank guarantee/bond (sum and place) (Cl. 26) (optional)<br><br>**Not Applicable** | 29. State if Cl. 16(ii) is applicable<br><br>**Not Applicable** |
| 30. Insurance (marine and war risks) (state value acc. to Cl. 16(i)(i) or, if applicable, Cl. 16(ii)(f))<br>**SGD 2.0 Million for Hull & Machinery** | 31. Additional insurance cover, if any, for Owners' account limited acc. to Cl. 16(i)(f) or, if applicable, Cl. 16(ii)(f)<br><br>**Charterer's to provide, Consolidated Pipe Carriers Pte Ltd as co-assured.** |
| 32. Additional insurance cover, if any, for Charterers' account limited acc. to Cl. 16(i)(f) or, if applicable, Cl. 16(ii)(f)<br><br>**Not Applicable** | 33. State the amount of franchise(s)/deductibles, if any (Cl. 16(i)(d)) or, if applicable (Cl. 16(ii)(d))<br><br>**Hull & Machinery Insurance deductible: SGD50,000.00** |
| 34. Brokerage commission and to whom payable (Cl. 29)<br><br>**Not Applicable** | |
| 35. Law and Arbitration (state 30(a), 30(b) or 30(c) of Clause 30, as agreed; if 30(c) agreed, also state place of arbitration) (if not filled in, 30(a) shall apply) (Cl. 30)<br><br>a)  <u>**30(c) – Singapore Law with Arbitration**</u><br>    State maximum amount for small claims/shortened arbitration (Cl. 30) | 36. Number of additional clauses covering special provisions, if agreed<br><br>**Clause 31 to 33** |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include PART I, including additional clauses, if any agreed and stated in Box 36, and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further.

| Signature (Owners/Agents) | Signature (Charterers) |
|---|---|
| <br><br>**CONSOLIDATED PIPE CARRIERS PTE LTD** | PETER COX<br><br>**TRIDENT AUSTRALASIA** |

PART II
"BARGEHIRE 94" Standard Barge Bareboat Charter Party

1. Definitions
In this Charter Party, the following terms shall have the meanings hereby assigned to them:
"The Owners" shall mean the person or company registered as the owners and/or disponent owners of the Barge.
"The Charterers" shall mean the bareboat charterers and shall not be construed to mean a time charterer or a voyage charterer.
"The Barge" shall mean the Barge named in Box 5 and with particulars as specified in Boxes 6 to 12.

2. Period of Charter Party
(a) In consideration of the hire detailed in Box 24, the Owners named in Box 3 let and the Charterers named in Box 4 hire the Barge for the period stated in Box 13.
(b) The Charterers shall have the option, on expiry of the period agreed in sub-clause (a), to extend the Charter Party by up to one-third of that period or forty-five (45) days, whichever is the lesser. The Charterers shall give minimum ten (10) days' notice of their intention to use said optional period or part thereof and in such case give a minimum of ten (10) days' notice of redelivery of the Barge.

3. Delivery
The Barge shall be delivered and taken over by the Charterers at the port or place stated in Box 14.
The Owners undertake that, at delivery, the Barge shall be of the description set out in PART I hereof. The Barge shall be delivered with cargo spaces free of any obstructions with all previous seafastenings removed and shall be properly documented as regards trading certificates, classification and equipment.
The delivery by the Owners of the Barge and the taking over of the Barge by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Barge.

4. Mobilisation and/or Demobilisation
Any mobilisation and/or demobilisation fee, if applicable, shall be paid as set out in Box 16.

5. Substitution
The Owners shall have the right to substitute the Barge, at any time up to fifteen (15) days prior to the delivery date, with an equivalent Barge suitable for the purpose of this Charter Party. Such substitution shall have no effect on the hire rates, terms and conditions of this Charter Party, save that any documented additional costs for preparing the substitute Barge for the service shall be for the Owners' account. The Charterers shall notify the Owners of the approximate additional cost, if any, within five (5) working days after the Owners advising the Charterers of their intention to substitute the Barge.

6. Time for Delivery
(a) The Barge shall be delivered to the Charterers within the period agreed in Box 17.
(b) The delivery period in sub-clause (a) shall be narrowed down by the Charterers in accordance with the delivery period notification schedule as stated in Box 18.
The declared delivery period shall always be within the previous declared delivery period and the number of days' notice shall always be counted from the first day in the declared delivery period.

7. Cancelling
(a) Should the Barge not be delivered according to Clause 3, the Owners shall pay as compensation to the Charterers a daily compensation stated in Box 19 for each day or part thereof counting from the agreed date for the delivery date until the day and time delivery actually takes place or an amount as stated in Box 20, whichever is the lesser. For the purpose of assessing compensation in accordance with this Clause 7 (a) the delivery date shall, in the event the Owners have given notice in accordance with Clause 7 (d) below and the Charterers have not exercised their option of cancelling, be deemed to be the revised delivery date stated in the Owners' notice.
(b) Should the Barge not be delivered at the latest seven days after the delivery date the Charterers shall have the option of cancelling this Charter Party and the Owners shall pay to the Charterers the amount stated in Box 20.
(c) Unless the late delivery is caused by the Owners' gross negligence or wilful default, the compensation stated in Boxes 19 and 20, respectively, shall be the Charterers' sole financial remedy for damages arising out of the late delivery.
(d) If it appears that the Barge will be delayed beyond seven (7) days after the delivery date, the Owners shall, as soon as they are in position to state with reasonable certainty the day on which the Barge should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling and the option must then be declared within forty-eight (48) hours of the receipt by the Charterers of such notice. If the Charterers do not then exercise their option of cancelling, the revised delivery date stated in the Owners' notice shall be regarded as the new delivery date for the purpose of this Clause.

8. Trading Limits
(a) The Barge shall be employed within its technical capabilities for work in inland, coastal and offshore waters without limit as to national sectors, but always in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 23.
It is expressly understood that the Barge shall be moored in ports or places to lie safely, always afloat at any time of tide. The Charterers undertake not to employ the Barge or suffer the Barge to be employed otherwise than in conformity with the terms of the instruments of insurance (including any warranties expressed or implied therein) without first obtaining, either by themselves or through the Owners, the consent to such employment of the Barge's insurers and complying with such requirements as to extra premium or otherwise as the insurers may prescribe. The Charterers shall keep the Owners advised of the intended employment of the Barge.
(b) Without the prior written consent of the Owners, the Barge shall not enter any ice-bound ports, places or waters or any ports where lights or lightships have been or are about to be withdrawn by reason of ice or where there is a risk that in the ordinary course of things the Barge will not be able on account of ice to safely enter the port, use the port, or leave after having completed loading or discharging.
(c) Towage of the Barge in tandem, that is by the same tug(s) but together with any other floating object, is not permitted unless the Owners' prior written consent is obtained.

9. Excluded Cargoes
Notwithstanding any provisions to the contrary in this Charter Party it is agreed that nuclear fuels or radioactive materials or waste shall not be loaded or carried under this Charter Party. Stone or similar cargo shall not be carried unless the Owners' prior written consent is obtained.

10. Surveys
(a) The Owners and the Charterers shall appoint a mutually acceptable qualified marine surveyor to determine and provide written reports on the condition of the Barge (including internal inspection of the tank




126 compartments to establish the condition of the bottom of the Barge)
127 together with its equipment, machinery and spares at the times of
128 delivery and redelivery hereunder. It is agreed between the parties
129 hereto that the survey reports shall be taken as conclusive evidence of
130 the condition of the Barge and its equipment on delivery and redelivery.
131 In the event of damage to the Barge during the Charter Party period,
132 the appointed marine surveyor shall in his off-hire survey report assess
133 the cost for repairing such damage and the time required for such
134 repairs and these figures shall be binding on both parties, except for
135 damage recoverable under the Barge's insurance.
136 (b) The cost for the 4n-hire survey and off-hire survey shall be shared
137 equally between the Owners and the Charterers. Loss of time, if any, in
138 connection with the on-hire survey, shall be borne by the Owners. Loss
139 of time, if any, in connection with the off-hire survey, shall be borne by
140 the Charterers, including in each case the cost of any docking and
141 undocking, if required, in connection herewith.
142
143 **11. Inventories and Consumable Oil and Stores**
144 A complete inventory of the Barge's entire equipment, outfit, appliances
145 and of all consumable stores onboard the Barge shall be made by the
146 marine surveyor on delivery and again on redelivery. The Charterers
147 and the Owners shall respectively at the time of delivery and redelivery
148 take over all bunkers, lubricating oil, water, paints, oils, ropes and other
149 consumable stores on board the Barge at the then current market
150 prices at the ports of delivery and redelivery respectively.
151
152 **12. Inspection**
153 (a) The Owners shall have the right at any time to inspect or survey the
154 Barge or instruct a duly authorised surveyor to carry out such survey on
155 their behalf to ascertain the condition of the Barge and satisfy
156 themselves that the Barge is being properly repaired and maintained.
157 (b) The costs for the inspection or survey shall be borne by the Owners
158 and the inspection shall not hamper the operation of the Charterers. All
159 time in respect of inspection, survey or repairs shall count as time on
160 hire and shall form part of the Charter Party period. The Owners have
161 the right to require the Barge to be dry-docked for inspection at normal
162 classification intervals. The costs of such dry-docking shall be for the
163 account of and in the time of the party responsible for maintaining class
164 according to Clause 16.
165 (c) All incidents occurring to the Barge shall immediately be reported in
166 writing to the Owners and the Charterers shall, whenever required by
167 the Owners, furnish them with full information in writing regarding any
168 casualties or other accidents or damage to the Barge.
169
170 **13. Maintenance and Operation**
171 (a) The Barge shall during the Charter Party period be in the full
172 possession and at the absolute disposal for all purposes of the
173 Charterers and under their complete control in every respect. The
174 Charterers shall maintain the Barge, her machinery, appurtenances and
175 spare parts in a good state of repair, in efficient operating condition and
176 in accordance with good commercial maintenance practice and, except
177 as provided for in Clause 16(f)(k), if applicable, they shall keep the
178 Barge with unexpired classification of the class indicated in Box 10 and
179 with other required certificates in force at all times.
180 The Charterers shall take immediate steps to have the necessary
181 repairs done within a reasonable time failing which the Owners shall
182 have the right of withdrawing the Barge from the service of the
183 Charterers without noting any protest and without prejudice to any claim
184 the Owners may otherwise have against the Charterers under the
185 Charter Party.
186 Unless otherwise agreed, in the event of any improvement, structural
187 changes or expensive new equipment becoming necessary for the
188 continued operation of the Barge by reason of new class requirements

189 or by compulsory legislation costing more than five per cent. (5%) of the
190 Barge's marine insurance value as stated in Box 30, then the extent, if
191 any, to which the ratio of hire shall be varied and the ratio in which the
192 cost of compliance shall be shared between the parties concerned in
193 order to achieve a reasonable distribution thereof as between the
194 Owners and the Charterers having regard, inter alia, to the length of the
195 period remaining under the Charter Party, shall in the absence of
196 agreement, be referred to arbitration according to Clause 30.
197 The Charterers are required to establish and provide evidence of
198 financial security or responsibility in respect of oil or other pollution
199 damage as required by any government, including Federal, state or
200 municipal or other division or authority thereof, to enable the Barge,
201 without penalty or charge, lawfully to enter, remain at, or leave any part,
202 place, territorial or contiguous waters of any country, state or
203 municipality in performance of this Charter Party without any delay. This
204 obligation shall apply whether or not such requirements have been
205 lawfully imposed by such government or division or authority thereof.
206 The Charterers shall make and provide evidence of all arrangements by
207 bond or otherwise as may be necessary to satisfy such requirements at
208 the Charterers' sole expense and the Charterers shall indemnify and
209 hold harmless the Owners against all consequences whatsoever for any
210 failure or inability to do so. However, notwithstanding this responsibility
211 of the Charterers, if Clause 16(f) is applicable, the Charterers shall have
212 the benefit of the Owners' P & I
213 insurance, with regard to providing evidence of financial responsibility,
214 subject always to the applicable terms and conditions agreed under the
215 Owners' P & I entry, and any additional premium in this respect shall be
216 for the Charterers' account.
217 (b) The Charterers shall at their own expense and by their own
218 procurement navigate, operate, supply, fuel and repair the Barge
219 whenever required during the Charter Party period and they shall pay all
220 charges and expenses of every kind and nature whatsoever incidental
221 to their use and operation of the Barge under this Charter Party,
222 including all taxes except those taxes payable on the Owners' income in
223 the country of registration of the Barge and/or the Owners' registered
224 office.
225 (c) During the currency of this Charter Party, the Barge shall retain her
226 present name as indicated in Box 6 and shall remain under and fly the
227 flag as indicated in Box 5, provided however that the Charterers shall
228 have the liberty to paint the Barge in their own colours, install and
229 display their insignia and fly their own house flag. Painting and re-
230 painting, installment and re-installment shall be for the Charterers'
231 account and time used thereby shall count as time on hire.
232 (d) The Charterers shall make no structural changes to the Barge or
233 changes in the machinery, appurtenances or spare parts thereof without
234 in each instance securing the Owners' prior written approval thereof. If
235 the Owners so approve, the Charterers shall, at their expense and in
236 their time, restore the Barge to its former condition before the
237 termination of the Charter Party, if the Owners so require.
238 (e) The Charterers shall have the use of all outfit, equipment and
239 appliances on board the Barge at the time of delivery, provided the
240 same or their substantial equivalent shall be returned to the Owners on
241 redelivery in the same good order and condition as when received,
242 ordinary wear and tear excepted. The Charterers shall from time to time
243 during the Charter Party period replace such items of equipment as
244 shall be damaged beyond ordinary wear and tear. The Charterers shall
245 procure that all repairs to or replacement of any damaged, worn or lost
246 parts or equipment be effected in such manner (both as regards
247 workmanship, specification and quality of materials) as not to diminish
248 the value of the Barge. The Charterers have the right to fit additional
249 equipment at their expense and risk but the Charterers shall remove
250 such equipment at the end of the period at their cost and prior to the
251 redelivery of the Barge, unless otherwise mutually agreed in advance




and in writing. The Barge's ballast tanks shall be used for ballast only.

The Charterers shall, in their time and for their account, effect the dry-dock and clean and paint her underwater parts whenever this may be necessary.

**14. Ballast Engineer**

259 The Barge may be ballasted, and if submersible, submerged and
260 surfaced by the Charterers subject to the Charterers always using a
261 fully qualified ballast engineer for such operations.
262 In case the Charterers request in writing and the Owners agree to
263 provide a ballast engineer, a notice for same of seventy two (72) hours
264 plus allowance for traveling time to be given by the Charterers for every
265 occasion the Owners' ballast engineer is required. The Charterers
266 agree to pay to the Owners an amount per day as stated in Box 21 per
267 ballast engineer for up to ten (10) hours work per day including but not
268 limited to traveling time and/or time for standby associated therewith.
269 For any hour in excess of ten (10) hours per day the Charterers shall
270 pay an amount per hour as stated in Box 22 for each ballast engineer.
271 In addition the Charterers shall pay all travel expenses, accommodation
272 expenses and meals for each ballast engineer, all according to the
273 Owners' invoice, and reimburse the Owners for any advance payments
274 they have made in this respect.
275 The ballast engineer shall be deemed to be a servant of the Charterers
276 and the Charterers shall indemnify and hold the Owners harmless from
277 and against all consequences and/or liabilities arising from the ballast
278 operations.
279

**15. Hire**
280
281 (a) The Charterers shall pay to the Owners for the hire of the Barge at
282 the rate per day as indicated in Box 24 commencing at 0000 hours on
283 and from the date of her delivery to the Charterers. Hire to continue
284 until 2400 hours on the date when the Barge is redelivered by the
285 Charterers to the Owners.
286 (b) Payment of hire shall be made in cash without discount every month
287 in advance on the first day of each month, in the currency and in the
288 manner indicated in Box 26 and at the place mentioned in Box 27.
289 (c) Payment of hire for the first and last month's hire if less than a full
290 month shall be calculated proportionally according to the number of
291 days in the particular calendar month and advance payment shall be
292 effected accordingly.
293 (d) Should the Barge be lost or missing, hire shall cease from the date
294 and time when she was lost or last heard of. Any hire paid in advance
295 shall be adjusted accordingly.
296 (e) Time shall be of the essence in relation to payment of hire
297 hereunder. In default of punctual and regular payment as herein
298 specified, the Owners may require the Charterers to make payment of
299 the amount due within ninety-six (96) running hours of receipt of
300 notification from the Owners, failing which the Owners shall have the
301 right to withdraw the Barge without prejudice to any other claim the
302 Owners may have against the Charterers under this Charter Party.
303 Further, so long as the hire remains unpaid, the Owners shall be
304 entitled to suspend the performance of any and all of their obligations
305 hereunder and shall have no responsibility whatsoever for any
306 consequences thereof in respect of which the Charterers hereby
307 indemnify the Owners. Hire shall continue to accrue and extra
308 expenses resulting from such suspension shall be for the Charterers'
309 account. (f) Any delay in payment of hire shall entitle the Owners to an
310 interest at the rate per annum as agreed in Box 25. If Box 25 has not
311 been filled in, the overnight interbank offered rate quoted in London
312 (LIBOR) for the currency stated in Box 26, increased by two per cent.
313 (2%), shall apply.
314

**16. Insurance, Repairs and Classification**
315 (i) (a) During the Charter Party period the Barge shall be kept insured by
316 the Owners at their expense against marine, war and Protection and
317 Indemnity risks, including wreck removal, the certificates of which shall
318 be made available upon the Charterers' request. All insurance policies
319 shall be in the joint names of the Owners and the Charterers as their
320 interests may appear. The Owners, at the request of the Charterers,
321 shall apply to their insurers to include the Charterers' nominated
322 principals as co-insured.
323
324 (b) In the event that any act or negligence of the Charterers shall vitiate
325 any of the insurances herein provided, the Charterers shall pay to the
326 Owners all losses and indemnify the Owners against all claims and
327 demands which would otherwise have been covered by such insurance.
328 (c) The Charterers shall, subject to the approval of the Owners or the
329 Owners' insurers, effect all insured repairs and the Charterers shall
330 undertake settlement of all expenses in connection with such repairs as
331 well as all insured charges, expenses and liabilities, to the extent of
332 coverage under the insurances provided for under the provisions of sub-
333 clause (a) of this Clause. The Charterers shall be secured
334 reimbursement through the Owners' insurers for such expenditures
335 upon presentation of accounts.
336 (d) The Charterers also to remain responsible for and to remedy
337 damage and settle costs and expenses incurred thereby in respect of all
338 other damage not covered by the insurances and/or not exceeding any
339 possible franchise(s) or deductibles as stated in Box 33 provided for in
340 the insurances. All such franchise(s) or deductibles, which are
341 applicable for each and every incident, are for the Charterers' account.
342 (e) All time used for repairs under the provisions of sub-clauses (c) and
343 (d) of this Clause, including any deviation, shall count as time on hire
344 and shall form part of the Charter Party period.
345 (f) If the conditions of the above insurances permit additional insurance
346 to be placed by the parties, such cover shall be limited to the amount for
347 each party set out in Box 31 and Box 32, respectively. The Owners or
348 the Charterers, as the case may be, shall immediately furnish the other
349 party with particulars of any additional insurance effected, including
350 copies of any cover notes or policies and the written consent of the
351 insurers of any such required insurance in any case where the consent
352 of such insurers is necessary.
353 (g) Should the Barge become an actual, constructive, compromised or
354 agreed total loss under the insurances required under sub-clause (a) of
355 this Clause, all insurance payments for such loss shall be paid to the
356 Owners, who shall distribute the moneys between themselves and the
357 Charterers according to their respective interests.
358 (h) If the Barge becomes an actual, constructive, compromised or
359 agreed total loss under the insurances arranged by the Owners in
360 accordance with sub-clause (a) of this Clause, this Charter Party shall
361 terminate as of the date of such loss.
362 (i) The Charterers shall, upon the request of the Owners, promptly
363 execute such documents as may be required to enable the Owners to
364 abandon the Barge to the insurers and claim a constructive total loss.
365 (j) For the purpose of insurance coverage against marine and war risks
366 under the provisions of sub-clause (a) of this Clause, the value of the
367 Barge is the sum indicated in Box 30.
368 (k) Notwithstanding anything contained in Clause 13 (a), it is agreed that
369 under the provisions of Clause 16 (i), if applicable, the Owners shall
370 keep the Barge with unexpired classification in force at all times during
371 the Charter Party period.
372 (ii) (Optional, only to apply if expressly agreed and stated in Box 26, in
373 which event Clause 16(i) shall be considered deleted).
374 (a) During the Charter Party period the Barge shall be kept insured by
375 the Charterers at their expense against marine, war, Protection and
376 Indemnity risks, including wreck removal, the certificates of which shall
377 be made available upon the Owners' request. Such marine, war and P &




378 ~~shall be arranged by the Charterers to protect the interests~~
379 ~~of both the Owners and the Charterers and mortgagees (if any), and the~~
380 ~~Charterer shall be at liberty to protect under such insurances the~~
381 ~~interests of any managers they may appoint. All insurance policies shall~~
382 ~~be in the joint names of the Owners and the Charterers as their~~
383 ~~interests may appear. The Charterers at the request of the Owners~~
384 ~~shall apply to their insurers to include the Owners' nominated principals~~
385 ~~as co-assured.~~
386 ~~(b) Should the Barge become an actual, constructive, compromised or~~
387 ~~agreed total loss under the insurances required under sub-clause (a) of~~
388 ~~this Clause, all insurance payments for such loss shall be paid to the~~
389 ~~mortgagee, if any, in the manner described in the deed(s) of covenant,~~
390 ~~who shall distribute the moneys between themselves, the Owners and~~
391 ~~the Charterers according to their respective interests. The Charterers~~
392 ~~undertake to notify the Owners and the mortgagee, if~~
393 ~~any, of any occurrences in consequence of which the Barge is likely to~~
394 ~~become a total loss as defined in this Clause.~~
395 ~~(c) The Charterers shall, subject to the approval of the Owners and the~~
396 ~~insurers, effect all insured repairs and shall undertake settlement of all~~
397 ~~costs in connection with such repairs as well as insured charges,~~
398 ~~expenses and liabilities (reimbursement shall be secured by the~~
399 ~~Charterers from the insurers) to the extent of coverage under the~~
400 ~~insurances herein provided for.~~
401 ~~(d) The Charterers also to remain responsible for and to remedy~~
402 ~~damage and extra costs and expenses incurred thereby in respect of~~
403 ~~all other damage not covered by the insurances and/or not exceeding~~
404 ~~any possible franchise(s) or deductibles as stated in Box 32 provided~~
405 ~~for in the insurances. All such franchise(s) or deductibles, which are~~
406 ~~applicable for each and every incident, are for the Charterers' account.~~
407 ~~(e) All time used for repairs under the provisions of sub-clauses (c) and~~
408 ~~(d) of this Clause including any deviation shall count as time on hire and~~
409 ~~shall form part of the Charter Party period.~~
410 ~~(f) If the conditions of the above insurances permit additional insurance~~
411 ~~to be placed by the parties, such cover shall be limited to the amount~~
412 ~~for each party set out in Box 31 and Box 32 respectively. The Owners~~
413 ~~or the Charterers, as the case may be, shall immediately furnish the~~
414 ~~other party with particulars of any additional insurance effected,~~
415 ~~including copies of any cover notes or policies and the written consent~~
416 ~~of the insurers of any such required insurance in any case where the~~
417 ~~consent of such insurers is necessary.~~
418 ~~(g) If the Barge becomes an actual, constructive, compromised or~~
419 ~~agreed total loss under the insurances arranged by the Charterers in~~
420 ~~accordance with sub-clause (a) of this Clause, this Charter Party shall~~
421 ~~terminate as of the date of such loss.~~
422 ~~(h) The Owners shall, upon the request of the Charterers, promptly~~
423 ~~execute such documents as may be required to enable the Charterers~~
424 ~~to abandon the Barge to the insurers and claim a constructive total loss.~~
425 ~~(i) For the purpose of insurance coverage against marine and war risks~~
426 ~~under the provisions of sub-clause (a) of this Clause, the value of the~~
427 ~~Barge is the sum indicated in Box 30.~~
428

429 **17. Charterers' Responsibilities**
430 The Charterers shall be liable for
431 (a) All loss or damage suffered by third parties, including bodily injuries
432 and death, and caused by the Barge and/or its equipment during the
433 period of hire.
434 (b) All loss of or damage to cargo, howsoever caused, or for damage
435 caused by the cargo, including bodily injuries and death.
436 (c) Any sums whatsoever in consequence of the Barge becoming a
437 wreck or obstruction to navigation.
438 The Charterers undertake to indemnify and hold the Owners harmless
439 against any third party claims arising from such loss or damage,
440 including possible loss of time on hire

441
442 **18. Force Majeure**
443 Neither the Owners nor the Charterers shall be responsible for any loss
444 or damage or delay or failure in performance under this Charter Party
445 resulting from Act of God, war, civil commotion, quarantine, strikes,
446 lock-outs, arrest or restraint of princes, rulers and peoples or any other
447 event whatsoever which cannot be avoided or guarded against.

448
449 **19. Consequential Loss**
450 Except as elsewhere provided in this Charter Party, neither the Owners
451 nor the Charterers shall be responsible for any consequential loss,
452 howsoever caused, including but not limited to damage or decline in the
453 market value of the Barge or goods during delays, loss of profit or loss
454 of business opportunities in respect of any claim that the one may have
455 against the other.

456
457 **20. Redelivery**
458 Upon the expiration of this Charter Party, the Charterers shall redeliver
459 the Barge safely moored at the port or place stated in Box 15. Such
460 port/place of redelivery to be always safe and accessible for the tug and
461 the Barge,and where they can lie always safe and afloat at all tides. The
462 Barge shall be redelivered to the Owners in the same or as good a
463 structure, state, condition and class as that in which she was delivered,
464 ordinary wear and tear excepted, with cargo spaces free of any
465 obstructions with all previous seafastenings removed and shall be
466 properly documented as regards trading certificates, classification and
467 equipment.
468 If the Charterers, for any reason whatsoever, fail to redeliver the Barge
469 on expiry of the Charter Party period, or any amendment to same, which
470 has to be agreed in advance and in writing, the Owners shall be entitled
471 to the agreed rate or to the market rate for that period, whichever is the
472 higher increased by the amount stated in Box 20. Unless the late
473 redelivery is caused by the Charterers' negligence or wilful default, this
474 compensation shall be the Owners' sole financial remedy for damages
475 arising out of late redelivery.
476

477 **21. Early Redelivery**
478 Upon giving seven (7) days' prior notice to the Owners, the Charterers
479 shall, notwithstanding any other provision of this Charter Party, be
480 entitled to effect early redelivery of the Barge and to terminate this
481 Charter Party at any time during the period of the Charter Party as
482 agreed according to Clause 2, provided however, that if exercising this
483 option, the Charterers shall pay hire for the remainder of the period of
484 the Charter Party as agreed according to Clause 2.
485

486 **22. Non-Lien and Indemnity**
487 The Charterers will not suffer, nor permit to be continued, any lien or
488 encumbrance incurred by them or their agents, which might have
489 priority over the title and interest of the Owners in the Barge.
490 The Charterers further agree to fasten to the Barge in a conspicuous
491 place and to keep so fastened during the Charter Party period a notice
492 reading as follows:
493 "This Barge is the property of (name of the Owners). It is under charter
494 to (name of the Charterers) and by the terms of the Charter Party
495 neither the Charterers nor any of their representatives or sub-
496 contractors have any right, power or authority to create, incur or permit
497 to be imposed on the Barge any lien whatsoever."
498 The Charterers shall indemnify and hold the Owners harmless against
499 any lien of whatsoever nature arising upon the Barge during the Charter
500 Party period while she is under the control of the Charterers and on any
501 claims against the Owners arising out of or in relation to the operation
502 of the Barge by the Charterers. Should the Barge be arrested by reason of
503 claims or liens arising out of/nor operation hereunder by the fault of the




504 Charterers, the Charterers shall at their own expense take all
505 reasonable steps to secure that within a reasonable time the Barge is
506 released and at their own expense put up bail to secure release of the
507 Barge.
508
509 **23. Lien**
510 The Owners shall have a lien upon all cargoes (except property owned
511 by the Charterers' client) and sub-freights and sub-hire for all claims
512 under this Charter Party and the Charterers shall have a lien on the
513 Barge for all moneys paid in advance and not earned.
514
515 **24. General Average**
516 General Average, if any, shall be adjusted according to the York-
517 Antwerp Rules 1994 or any subsequent modification thereof current at
518 the time of the casualty.
519 The charter hire not to contribute to General Average.
520
521 **25. Assignment and Sub-Demise**
522 The Charterers shall not assign this Charter Party nor sub-demise the
523 Barge except with the prior consent in writing of the Owners, which
524 shall not be unreasonably withheld, and subject to such terms and
525 conditions as the Owners shall approve.
526 If, after obtaining the Charterers' agreement, which shall not be
527 unreasonably withheld, the Owners sell the Barge, either prior to
528 delivery or during the performance of this Charter Party, the Owners
529 shall have the right and be obliged to assign and transfer this Charter
530 Party to the buyer of the Barge upon giving the Charterers prompt
531 notice in writing of the buyers' full style and the time when the Barge will
532 be delivered to the buyers and the assignment will become effective. As
533 from that time the Owners shall be relieved from all obligations and
534 liabilities under this Charter Party and wherever the term the Owners
535 appears it shall thereafter be considered as a reference to the buyers.
536
537 **26. Bank Guarantee *
538 The Charterers undertake to furnish, before delivery of the Barge, a first
539 class bank guarantee or bond acceptable to the Owners in the sum and
540 at the place as indicated in Box 28 as guarantee for full performance of
541 their obligations under this Charter Party.**
542
543 *(Optional, only to apply if Box 28 is filled in).*
544
545 **27. Requisition/Acquisition**
546 (a) In the event of the requisition for hire of the Barge by any
547 governmental or other competent authority (hereinafter referred to as
548 'requisition for hire') irrespective of the date during the Charter Party
549 period when "requisition for hire" may occur and irrespective of the
550 length thereof and whether or not it be for an indefinite or a limited
551 period of time, and irrespective of whether it may or will remain in force
552 for the remainder of the Charter Party period, this Charter Party shall
553 not be deemed thereby or thereupon to be frustrated or otherwise
554 terminated and the Charterers shall continue to pay the stipulated hire
555 in the manner provided by this Charter Party until the time when the
556 Charter Party would have terminated pursuant to any of the provisions
557 hereof, always provided, however, that in the event of "requisition for
558 hire" any requisition hire or compensation received or receivable by the
559 Owners shall be payable to the Charterers during the remainder of the
560 Charter Party period or the period of the "requisition for hire", whichever
561 be the shorter.
562 The hire under this Charter Party shall be payable to the Owners from
563 the same time as the requisition hire is payable to the Charterers.
564 (b) In the event of the Owners being deprived of their ownership in the
565 Barge by any compulsory acquisition of the Barge or requisition for title
566 by any governmental or other competent authority (hereinafter referred
567 to as "compulsory acquisition"), then, irrespective of the date during the

567 Charter Party period when "compulsory acquisition" may occur, this
568 Charter Party shall be deemed terminated as of the date of such
569 "compulsory acquisition". In such event charter hire to be considered as
570 earned and to be paid up to the date and time of such
571 "compulsory acquisition".
572
573 **28. War**
574 (1) For the purpose of this Clause, the words "War Risks" shall include
575 any war (whether actual or threatened), act of war, civil war, hostilities,
576 revolution, rebellion, civil commotion, warlike operations, the laying of
577 mines (whether actual or reported), acts of piracy, acts of terrorists, acts
578 of hostility or malicious damage, blockades (whether imposed against
579 all barges and/or vessels or imposed selectively against barges of
580 certain flags or ownership, or against certain cargoes or crews or
581 otherwise howsoever), by any person, body, terrorist or political group,
582 or the Government of any state whatsoever, which, in the reasonable
583 judgment of the Owners, may be dangerous or are likely to be or to
584 become dangerous to the Barge or her cargo.
585 (2) The Barge, unless the written consent of the Owners be first
586 obtained, shall not be ordered to or required to continue to or through,
587 any port place, area or zone (whether of land or sea), or any waterway
588 or canal, where it appears that the Barge, or her cargo, in the
589 reasonable judgment of the Owners, may be, or are likely to be,
590 exposed to War Risks. Should
591 the Barge be within any such place as aforesaid, which only becomes
592 dangerous, or is likely to be or to become dangerous, after her entry into
593 it, the Owners shall have the right to require the Charterers to effect the
594 Barge to leave such area.
595 (3) The Barge shall not be required to load contraband cargo, or to pass
596 through any blockade, whether such blockade be imposed on all barges
597 and/or vessels, or is imposed selectively in any way whatsoever against
598 barges and/or vessels of certain flags or ownership, or against certain
599 cargoes or crews or otherwise howsoever, or to proceed to an area
600 where she shall be subject, or is likely to be subject to a belligerents
601 right of search and/or confiscation.
602 (4) If the insurers of the war risks insurance, when Clause 16(i) is
603 applicable, should require payment of premiums and/or calls because,
604 pursuant to the Charterers' orders, the Barge is within, or is due to anter
605 and remain within, any area or areas which are specified by such
606 insurers as being subject to additional premiums because of War Risks,
607 then such premiums and/or calls shall be reimbursed by the Charterers
608 to the Owners at the same time as the next payment of hire is due.
609 5) The Owners shall have the right to require the Charterers and the
610 Charterers shall have the liberty:
611 (a) to comply with all orders, directions, recommendations or advise as
612 to departure, arrival, routes, sailing in convoy, ports of call, stoppages,
613 destinations, discharge of cargo, delivery, or in any other way
614 whatsoever, which are given by the Government of the Nation under
615 whose flag the Barge sails, or other Government to whose laws the
616 Owners are subject, or any other Government, body or group
617 whatsoever acting with the power to compel compliance with their
618 orders or directions;
619 (b) to comply with the order, directions or recommendations of any war
620 risks underwriters who have the authority to give the same under the
621 terms of the war risks insurance;
622 (c) to comply with the terms of any resolution of the Security Council of
623 the United Nations, any directives of the European Community, the
624 effective orders of any other Supranational body which has the right to
625 issue and give the same, and with national laws aimed at enforcing the
626 same to which the Owners are subject, and to obey the orders and
627 directions of those who are charged with their enforcement;




628 (d) to divert and discharge at any other port any cargo or part thereof
629 which may render the Barge liable to confiscation as a contraband
630 carrier;
631 (6) If in accordance with their rights under the foregoing provisions of
632 this Clause, the Owners shall refuse permission to proceed to the
633 loading or discharging ports, or any one or more of them, they shall
634 immediately inform the Charterers. No cargo shall be discharged at any
635 alternative port without first giving the Charterers notice of the Owners'
636 intention to give permission to do so and requesting them to nominate a
637 safe port for such discharge. Failing such nomination by the Charterers
638 within 48 hours of the receipt of such notice and request, the Owners
639 may give orders to discharge the cargo at any safe port of their own
640 choice.
641 (7) If in compliance with any of the provisions of sub-clauses (2) to (6)
642 of this Clause anything is done or not done, such shall not be deemed a
643 deviation, but shall be considered as due fulfilment of this Charter
644 Party.

645
646 29. Commission
647 The Owners shall pay a commission at the rate indicated in Box 34 to
648 the brokers named in Box 34 on any hire, and
649 demobilisation fee paid under the Charter Party. If the commission is
650 not paid owing to breach of Charter Party by either party, the party
651 liable therefore to indemnify the brokers against their loss of
652 commission.
653 Should the parties agree to cancel the Charter Party, the Owners to
654 indemnify the brokers against any loss of commission but in such case
655 the commission not to exceed the brokerage on one year's hire.
656
657 30. Law and Arbitration
658 * (a)This Charter Party shall be governed by and construed in
659 accordance with English law and any dispute arising out of this Charter
660 Party shall be referred to arbitration in London in accordance with the
661 Arbitration Acts 1950 and 1979 or any statutory modification or re-

662 enactment thereof for the time being in force. Unless the parties agree
663 upon a sole arbitrator, one arbitrator shall be appointed by each party
664 and the arbitrators so appointed shall appoint a third arbitrator, the
665 decision of the three-man tribunal thus constituted or any two of them,
666 shall be final. On the receipt by one party of the nomination in writing of
667 the other party's arbitrator, that party shall appoint their arbitrator within
668 fourteen days, failing which the decision of the single arbitrator
669 appointed shall be final. For disputes where the total amount claimed by
670 either party does not exceed the amount stated in Box 35** the
671 arbitration shall be conducted in accordance with the Small Claims
672 Procedure of the London Maritime Arbitrators Association.
673 * (b)This Charter Party shall be governed by and construed in
674 accordance with Title 9 of the United States Code and the Maritime Law
675 of the United States and should any dispute arise out of this Charter
676 Party, the matter in dispute shall be referred to three persons at New
677 York, one to be appointed by each of the parties hereto, and the third by
678 the two so chosen; their decision or that of any two of them shall be
679 final, and for purpose of enforcing any award, this agreement may be
680 made a rule of the Court. The proceedings shall be conducted in
681 accordance with the rules of the Society of Maritime Arbitrators, Inc. For
682 disputes where the total amount claimed by either party does not
683 exceed the amount stated in Box 35** the arbitration shall be conducted
684 in accordance with the Shortened Arbitration Procedure of the Society
685 of Maritime Arbitrators, Inc.
686 * (c)Any dispute arising out of this Charter Party shall be referred to
687 arbitration at the place indicated in Box 35, subject to the procedures
688 applicable there. The laws of the place indicated in Box 35 shall govern
689 this Charter Party.
690 (d)If Box 35 in PART I is not filled in, sub-clause (a) of this Clause shall
691 apply.
692 * (a), (b) and (c) are alternatives; indicate alternative agreed in Box 35.
693 ** Where no figure is supplied in Box 35 in PART I, this provision only
694 shall be void but the other provisions of this Clause shall have full force
695 and remain in effect.





ADDITIONAL CLAUSE
"BARGEHIRE 94" Standard Barge Bareboat Charter Party

31. In addition to the provisions provided under Clause 10 of the Main Charter party, the barge's manhole covers are to be opened to allow ventilation at least twenty-four (24) hours prior to the On-Hire and Off-Hire surveys, to allow safe access to the tanks by the attending surveyor. The Owners shall be responsible and bear all cost for opening and closing of the Barge's manhole covers to facilitate On-Hire survey and the Charterers shall be responsible and bear all cost for opening and closing of the Barge's manhole covers to facilitate Off-Hire survey.

32. In the event ballasting of the Barge's tanks is required during the charter, the Charterers shall be responsible for the ballasting operations and safety of the Barge. Prior to "Off-Hire" and redelivery of the Barge to the Owners, the Charterers shall at their sole expense and time clean, dry-up and restore the tanks to the same condition as at On-Hire, fair wear and tear excepted. The Charterers agree to pay the Owners for tanks not cleaned at USD700 (United States Dollars Seven Hundred Only) per tank.

33. Owner shall rectify points identified as recommendations in Charterer-appointed marine warranty survey inspection report, to the satisfaction of marine warranty surveyor, prior the handover of the vessel to Charterer at their time and cost.



**Consolidated** **Pipe** **Carriers**



# BARGE: CPC 2808 (280 FT X 80 FT X 18FT)



| | |
|---|---|
| YEAR BUILT | : 2006 |
| FLAG | : SINGAPORE |
| PORT OF REGISTRY | : SINGAPORE |
| OFFICIAL NO | : 391368 |
| CLASSIFICATION | : GERMANISCHER LLOYD + 100 A5 PONTOON |
| GRT / NRT | : 2851 / 856 |
| LENGTH OVERALL | : 85.344 METRES |
| MOULDED BREADTH | : 24.384 METRES |
| MOULDED DEPTH | : 5.486 METRES |
| DEADWEIGHT | : +/- 6898 TONNES |
| DECK LOADING CAPACITY | : 10 TON / M² |
| DECK EQUIPMENT | : 1 STOCKLESS ANCHOR (1000KG) |
| | MANUAL WINCH WITH WIRE ROPE OF 24MM X 76MM |

Particulars given are entirely without warranty as to correctness and interested parties must satisfy themselves by inspection of ship's certificate or by other means of the vessel specification referred to.





**ADDENDUM No. 1 TO THE "BARGEHIRE 94" CHARTER PARTY , DATED 3rd January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "CPC 2808"**

**THIS ADDENDUM** made effective from 17th February 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF CPC 2808, shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

**Charter party Period**

1.) The Firm period of the Charter of the CPC 2808 is hereby extended from the 13th of January, 2009 until the 5th March, 2009, in direct continuation of its present Charter at the same Rate and Terms and Conditions as contained in the Main Charter Party and its Addenda.


CONSOLIDATED PIPECARRIERS PTE LTD.          TRIDENT AUSTRALASIA

**ADDENDUM No. 2 TO THE "BARGEHIRE 94" CHARTER PARTY , DATED 3rd January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "CPC 2808"**

**THIS ADDENDUM** made effective from 2nd of March 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF CPC 2808, shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

**Charter party Period**

1.) The Firm period of the Charter of the CPC 2808 is hereby extended from the 5th of March, 2009 until the 19th March, 2009, in direct continuation of its present Charter at the same Rate and Terms and Conditions as contained in the Main Charter Party and its Addenda.


CONSOLIDATED PIPECARRIERS PTE LTD.         TRIDENT AUSTRALASIA

# EXHIBIT 5

**Consolidated Pipe Carriers Pte Ltd**
152 Beach Road #12-03
Gateway East
189721
Singapore

| | | |
|---|---|---|
| CUSTOMER NO | | TRIDENTUSD |
| PAGE: | | 1 |
| DATE: | | 31/07/2009 |

| | | |
|---|---|---|
| CUSTOMER NO : | | TRIDENTUSD |
| PAGE: | | 1 |
| DATE: | | 31/07/2009 |

SOLD
TO:
TRIDENT AUSTRALASIA FZE
P.O Box 122319
Saif Zone, Sharjah
United Arab Emirates

REMIT TO ADDRESS:

Vessel : CPC 2808

| DOCUMENT | DOC DATE | TY. | REFERENCE/APPLIED NUMBER | DUE DATE | AMOUNT | PAID | BALANCE |
|---|---|---|---|---|---|---|---|
| 01/QG34/0013/09 | 31/01/2009 | IN | Hire from 13 Jan 09 to 31 Jan 09  CPC 2808 | 31/01/2009 | 41,800.00 | | 41,800.00 |
| 02/QG34/0040/09 | 02/02/2009 | IN | Hire from 1 Feb 09 to 28 Feb 09  CPC 2808 | 02/02/2009 | 61,600.00 | | 103,400.00 |
| 03/QG34/0072/09 | 02/03/2009 | IN | Hire from 1 March 09 to 31 March 09  CPC 2808 | 02/03/2009 | 68,200.00 | | 171,600.00 |
| 04/QG34/0086/09 | 06/04/2009 | IN | Hire from 1 April 09 to 6 April 09  CPC 2808 | 06/04/2009 | 13,200.00 | | 184,800.00 |
| | | | **Total Principal** | | | | **184,800.00** |
| | 31/07/2009 | | Interest for Invoice 01/QG34/0013/09 to 31st Jul 09 | | 2,487.39 | | 2,487.39 |
| | 31/07/2009 | | Interest for Invoice 02/QG34/0040/09 to 31st Jul 09 | | 3,625.12 | | 6,112.51 |
| | 31/07/2009 | | Interest for Invoice 03/QG34/0072/09 to 31st Jul 09 | | 3,385.71 | | 9,498.22 |
| | 31/07/2009 | | Interest for Invoice 04/QG34/0086/09 to 31st Jul 09 | | 503.41 | | 10,001.63 |
| | | | **Total Interest** | | | | **10,001.63** |
| | | | **Total Principal and Interest** | | | | **194,801.63** |
| | | | **Daily Interest Rate** | | | | **60.76** |

Thank you for keeping your account current.

| | | |
|---|---|---|
| IN  Invoice | PY  Applied Receipt | AC  Unapplied Cash |
| DB  Debit Note | EO  Earned Discount | RF  Refund |
| CR  Credit Note | AD  Adjustment | |
| IT  Interest Invoice | PY  Prepayment | |

| | | | |
|---|---|---|---|
| Credit Limit: | 0.00 | | |
| Credit Available: | 0.00 | | |
| Total | 194,801.63 | Total | 194,801.63 |

TO ENSURE PROPER CREDIT, PLEASE CHECK
THE ITEMS YOU ARE PAYING IN THE
COLUMN

| 1 - 30 DAYS O/DUE | 31 - 60 DAYS O/DUE | 61 - 90 DAYS O/DUE | OVER 90 DAYS O/DUE | Consolidated Pipe Carriers Pte Ltd |
|---|---|---|---|---|
| 10,001.63 | 0.00 | 0.00 | 184,800.00 | |




# EXHIBIT 6

Code Name: "SUPPLYTIME 89"

| 1. Place and Date: | UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS CODE NAME: "SUPPLYTIME 89" PART I |
|---|---|
| Singapore, 7th January, 2008 | |

| 2. Owners / Place of Business (full style, address and telex/telefax No) (Cl.1(a)) | 3. Charterer / Place of Business (full style, address, telex/telefax No) (Cl.1(a)) |
|---|---|
| Consolidated Pipe Carriers Pte Ltd<br>152 Gateway East<br>Beach Road #12-03<br>Singapore 189721<br><br>Tel: +65 6341 7887<br>Fax: +65 6341 7666 | Trident Australasia FZE<br>P.O. Box 122319<br>SAIF Zone, Sharjah<br>United Arab Emirates<br><br>+61 8 9225 2138<br>+61 8 9225 2120 |

| 4. Vessel's Name (Cl.1(a))<br>Express 23 | 5. Date of Delivery (Cl.2(a))<br>Between 12 and 16th January '09 | 6. Cancelling Date (Cl.2(a) and (c))<br>16th January |
|---|---|---|

| 7. Port or Place of Delivery (Cl.2(a))<br><br>Hamriyah Free Zone, Sharjah. | 8. Port or Place of Redelivery / Notice of Redelivery (Cl.2(d)) |
|---|---|
| | (i) Port or Place of Redelivery<br><br>Hamriyah Free Zone, Sharjah. |
| | (ii) Number of Day's Notice of Redelivery<br>7 days. |

| 9. Period of Hire (Cl.1(a))<br><br><br>30 Days Firm with option to extend. | 10. Extension of Period of Hire (Optional) (Cl.1(b)) |
|---|---|
| | (i) Period of Extension<br>Up to 20 days extension. |
| | (ii) Advance Notice for Declaration of Option (Days)<br><br>7 days. |

| 11. Automatic Extension Period to Complete Voyage or Well (Cl.1(c))<br>N/A | 12. Mobilization Charge (Lump Sum and When Due)<br>N/A |
|---|---|
| (i) Voyage or Well (State Which)<br><br>N/A | (i) Lump Sum (US$)<br><br>N/A |
| (ii) Maximum Extension Period (State Number of Days<br><br><br>20 days or by mutual agreement | (ii) When Due<br>N/A<br><br>13. Port or Place of Mobilization (Cl. 2(b)(i))<br>Hamriyah Free Zone, Sharjah. |

| 14. Early Termination of Charter (State Amount of Hire Payable)(Cl.26(a))<br><br>N/A | 15. Number of Days' Notice of Early Termination (Cl.26(a))<br>N/A | 16. Demobilization Charge (Lump Sum) (Cl.2(e) and 26(a))<br><br>NIL |
|---|---|---|

| 17. Area of Operation (Cl.5(a))<br><br>UAE & Iranian Waters | 18. Employment of Vessel Restricted to (State Nature of Service (s) (Cl.5(a))<br>All within capability of the vessel |
|---|---|



Code Name: "SUPPLYTIME 89"

| Continued | SUPPLYTIME 89 Uniform Time Charter Party | PART I |
|---|---|---|

| | |
|---|---|
| 19. *Charter Hire (State Rate & Currency) (Cl. 10(a) and (d))*<br><br>.   USD 2,800 per day (Nett to owner)<br>FUEL OIL, WATER AND TAX TO BE FOR CHARTERERS ACCOUNT | 20. *Extension Hire (If Agreed, State Rate) (Cl. 10(b))*<br><br>USD 2,800 per day (Nett to owner)<br>FUEL OIL, WATER AND TAX TO BE FOR CHARTERERS ACCOUNT |
| 21. *Invoicing for Hire & Other Payments (Cl.10(d))*<br><br>*(i) State whether to be issued in advance or arrears*<br><br>**In arrears at the end of each month.** | 22. *Payment (State Mode and Place of Payment; Also State Beneficiary and Bank Account) (Cl.10(e))*<br>**Telegraphic Transfer To:**<br>**As per invoicing instructions** |

| | |
|---|---|
| (ii) State to whom to be issued if addressee Other Than Box 2:<br>**N/A** | |
| (ii) State to whom to be issued if addressee Other Than Box 3:<br>**N/A** | |

| | | |
|---|---|---|
| 23. *Payment of Hire, Bunker Invoices and Disbursements for Charterer's Account (State Maximum Number of Days) (Cl.10(e))*<br>**10 days after invoice** | 24. *Interest Rate Payable (Cl.10(e))*<br><br>N/A | 25. *Maximum Audit Period (Cl.10(f))*<br><br>N/A |
| 26. *Meals (State Rate Agreed) (Cl.5(c)(i))*<br>N/A | 27. *Accommodation (Rate Agreed) (Cl.5(c)(i))*<br>N/A. | 28. *Mutual Waiver of Recourse (Optional, State Whether Applicable) (Cl.12(f))*<br><br>N/A |
| 29. *Sublet (State Amount of Daily Increment to Charter Hire) (Cl.17(b))*<br>N/A | | 30. *War (State Name of Countries) (Cl.19(e))*<br><br>Persian Gulf |
| 31. *General Average (Place of Settlement - Only to be filled in if other than London) (Cl.21)*<br>N/A | | 32. *Breakdown (State Period) (Cl.26(b)(v))*<br><br>5 days |
| 33. *Law and Arbitration (State Cl.31(a) or 31(b) or 31(c) As Agreed; if Cl.31(c) agreed also state place of arbitration) (Cl.31)*<br><br>English Law, Dubai | | 34. *Numbers of Additional Clauses Covering Special Provisions If Agreed*<br><br>N/A |
| 35. *Name and Address for Notices and Other Communications Required to be Given by the Owners (Cl.28)*<br><br>As Per Box 3 | | 36. *Name and Address for Notices and Other Communications Required to be Given by the Charterer (Cl.28)*<br><br>As Per Box 2 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but not further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| *Alvin Lim - Managing Director* | |



## 1    Period

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as "the vessel"), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.

(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii).

(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(i)) in progress, such time not to exceed the period stated in Box 11(ii).

## 2.   Delivery and Redelivery

(a) Delivery – Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.

(b) Mobilisation – (i) the Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13.

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost.

(c) Cancelling – If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5, and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.

(d) Redelivery – The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii).

(e) Demobilisation – The Charterers shall pay a lump sum without discount in the amount as stated in Box 16 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.

## 3.   Condition of Vessel

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A", attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party.

(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 5.

## 4.   Survey

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

## 5.   Employment and Area of Operation

(a) The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 18, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. Unless otherwise agreed, the Vessel shall not be employed as a diving platform.

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences.

(c) The Vessel's Space – The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The



p.t.o.

Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:

(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation.

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.

(iv) Hazardous and noxious substances, subject to Clause 12(g), proper notification and any pertinent regulations.

(d) Laying-up of Vessel – The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel

## 6. Master and Crew

(a)(i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.

(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents.

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.

(c) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment.

(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charterer Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

## 7. Owners to Provide

(a) The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ship's purposes mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability.

(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' expense with any towing and anchor handling equipment specified in Section 5(b) of ANNEX "A". If during the Charter Period any such equipment becomes lost, damaged or unserviceable, other than as a result of the Owners' negligence, the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense.

## 8. Charterers to Provide

(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred



# PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

in connection with the Owners' business; light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise).

(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, cleaning of cargo tanks, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, inert gas required for the protection of cargo, and electrodes used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc. used for offshore works, all hose connections and adaptors, and further, shall refill oxygen / acetylene bottles used for offshore works.

(c) The Charterers shall pay for customs duties, all permits, import duties (including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, both for the Vessel and/or equipment, required for or arising out of this Charter Party.

### 9. Bunkers

Unless otherwise agreed, the Vessel shall be delivered with bunkers and lubricants as on board and redelivered with sufficient bunkers to reach the next bunkering stage en route to her next port of call. The Charterers upon delivery and the Owners upon redelivery shall take over and pay for the bunkers and lubricants on board at the prices prevailing at the times and ports of delivery and redelivery.

### 10. Hire and Payments

(a)  Hire  - The Charterers shall pay Hire for the Vessel at the rate stated in Box 19 per day or pro rata for part thereof from the time that the Vessel is delivered to the Charterers until the expiration or earlier termination of this Charter Party.

(b)  Extension Hire  - If the option to extend the Charter Period under Clause 1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be mutually agreed between the Owners and the Charterers.

(c)  Adjustment of Hire  - The rate of hire shall be adjusted to reflect documented changes, after the date of entering into the Charter Party or the date of commencement of employment, whichever is earlier, in the Owners' costs arising from changes in the Charterers' requirements or regulations governing the Vessel and/or its Crew or this Charter Party.

(d)  Invoicing  - All invoices shall be issued in the contract currency stated in Box 19. In respect of reimbursable expenses incurred in currencies other than the contract currency, the rate of exchange into the contract currency shall be that quoted by the Central Bank of the country of such other currency as at the date of the Owners' invoice. Invoices covering Hire and any other payments due shall be issued monthly as stated in Box 21(i) or at the expiration or earlier termination of this Charter Party. Notwithstanding the foregoing, bunkers and lubricants on board at delivery shall be invoiced at the time of delivery.

(e)  Payments  - Payments of Hire, bunker invoices and disbursements for the Charterers' account shall be received within the number of days stated in Box 23 from the date of receipt of the invoice. Payment shall be made in the contract currency in full without discount to the account stated in Box 22. However any advances for disbursements made on behalf of and approved by the Owners may be deducted from Hire due.

If payment is not received by the Owners within 5 banking days following the due date the Owners are entitled to charge interest at the rate stated in Box 24 on the amount outstanding from and including the due date until payment is received.

Where an invoice is disputed, the Charterers shall in any event pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed portion provided that such portion is reasonably disputed and the Charterers specify such reason. Interest will be chargeable at the rate stated in Box 24 on such disputed amounts where resolved in favour of the Owners. Should the Owners prove the validity of the disputed portion of the invoice, balance payment shall be received by the Owners within 5 banking days after the dispute is resolved. Should the Charterers' claim be valid, a corrected invoice shall be issued by the Owners.

In default of payment as herein specified, the Owners may require the Charterers to make payment of the amount due within 5 banking days of receipt of notification from the Owners; failing which the Owners shall have the right to withdraw the Vessel without prejudice to any claim the Owners may have against the Charterers under this Charter Party.

While payment remains due the Owners shall be entitled to suspend the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and Hire shall continue to accrue and any extra expenses resulting from such suspension shall be for the Charterers' account.

(f)  Audit  - The Charterers shall have the right to appoint an independent chartered accountant to audit the Owners' books directly related to this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 25, to determine the validity of the Owners' charges hereunder. The Owners undertake to make their records available for such purposes at their principal place of business during normal working hours. Any discrepancies discovered in payments made shall be promptly resolved by invoice or credit as appropriate.

### 11. Suspension of Hire

(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accidents to the Vessel, the Vessel is prevented from working, no Hire shall be payable in respect of any time lost and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of :



(i) the carriage of cargo as noted in Clause 5c (iii) and (iv);

(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel without the consent or the instructions of the Charterers;

(iii) deviation from her Charter Party duties or exposure to abnormal risks at the request of the Charterers;

(iv) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;

(v) detention or damage by ice;

(vi) any act or omission of the Charterers, their servants or agents.

(b) <u>Liability for Vessel not Working</u> - The Owners' liability for any loss, damage or delay sustained by the Charterers as a result of the Vessel being prevented from working by any cause whatsoever shall be limited to suspension of hire.

(c) <u>Maintenance and Drydocking</u> - Notwithstanding sub-clause (a) hereof, the Charterers shall grant the Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter Period for maintenance and repairs including drydocking (hereinafter referred to as "maintenance allowance"). The Vessel, shall be drydocked at regular intervals. The Charterers shall place the Vessel at the Owners' disposal clean of cargo, at a port (to be nominated by the Owners at a later date) having facilities suitable to the Owners for the purpose of such drydocking. During reasonable voyage time taken in transits between such port and Area of Operation the Vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance.

Hire shall be suspended during any time taken in maintenance repairs ~~and drydocking in excess of the accumulated maintenance allowance~~.

In the event of less time being taken by the Owners for repairs and drydocking or, alternatively, the Charterers not making the Vessel available for all or part of this time, the Charterers shall, upon expiration or earlier termination of the Charter Party, pay the equivalent of the daily rate of Hire then prevailing in addition to Hire otherwise due under this Charter Party in respect of all such time not so taken or made available.

Upon commencement of the Charter Period, the Owners agree to furnish the Charterers with the Owners' proposed drydocking schedule and the Charterers agree to make every reasonable effort to assist the Owners in adhering to such predetermined drydocking schedule for the Vessel.

**12. Liabilities and Indemnities**

(a) <u>Owners</u> - Notwithstanding anything else contained in this Charter Party excepting Clauses 5(c)(iii), 7(b), 8(b), 12(g), 15(c) and 21, the Charterers shall not be responsible for loss of or damage to the property of the Owners or of their contractors and sub-contractors, including the Vessel, or for personal injury or death of the employees of the Owners or of their contractors and sub-contractors, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, injury or death is caused wholly or partially by the act, neglect or default of the Charterers, their employees, contractors or sub-

contractors, and even if such loss, damage injury or death is caused wholly or partially by unseaworthiness of any vessel; and the Owners shall indemnify, protect, defend and hold harmless the Charterers from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury or death.

(b) <u>Charterers</u> - Notwithstanding anything else contained in this Charter Party excepting Clause 21, the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors, including their offshore units, or for personal injury or death of the employees of the Charterers or of their contractors and sub-contractors (other than the Owners and their contractors and sub-contractors) or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel; and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death.

(c) <u>Consequential Damages</u> - Neither party shall be liable to the other for, and each party hereby agrees to protect, defend and indemnify the other against, any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter Party, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

(d) <u>Limitations</u> - Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party.

(e) <u>Himalaya Clause</u> - (i) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of this Charter Party shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sub-contractors, clients, joint venturers and joint interest owners (always with respect to the job or project on which the Vessel


p.t.o.

is employed); their respective employees and their respective underwriters.

(ii) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies, the Owners' sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator, its demise charterer(s), their respective employees and their respective underwriters.

(iii) The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties.

(f) Mutual Waiver of Recourse (Optional only applicable if stated in Box 28, but regardless of whether this option is exercised the other provisions of Clause 12 shall apply and shall be paramount)
In order to avoid disputes regarding liability for personal injury or death of employees or for loss of or damage to property, the Owners and the Charterers have entered into, or by this Charter Party agree to enter into, an Agreement for Mutual Indemnity and Waiver of Recourse (in a form substantially similar to that specified in ANNEX "C") between the Owners, the Charterers and the various contractors and sub-contractors of the Charterers.

(g) Hazardous and Noxious Substances
Notwithstanding any other provision of this Charter Party to the contrary, the Charterers shall always be responsible for any losses, damages or liabilities suffered by the Owners, their employees, contractors or sub-contractors, by the Charterers, or by third parties, with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous and noxious substances in whatever form as ordered by the Charterers, and the Charterers shall defend, indemnify the Owners and hold the Owners harmless for any expense, loss or liability whatsoever or howsoever arising with respect to the carriage of hazardous or noxious substances.

### 13. Pollution

(a) Except as otherwise provided for in Clause 15(c) (iii), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against, all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of actual or potential pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause or allow discharge, spills or leaks from the Vessel, except as may emanate from cargo thereon or therein.

(b) The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or potential pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors or by the unseaworthiness of the Vessel.

### 14. Insurance

(a) (i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners.

(ii) The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party.

(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party.

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party.

### 15. Saving of Life and Salvage

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services.
All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.
The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.
If the Owners render assistance to such property in distress on the basis of "no claim for



p.t.o.

salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expenses arising by reason of such actual or potential spill, seepage and/or emission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub-clause, and time taken for such repairs shall not count against time granted under Clause 11(c).

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

### 16. Lien

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

### 17. Sublet and Assignment

(e) Charterers - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel.

(b) If the Vessel is subject, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers.

(c) Owners - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the service which is sublet or assigned.

### 18. Substitute Vessel

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld.

### 19. War

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers.

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owning to loss of or injury to the Master, Officers Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks.

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters



# PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war ( whether there be a declaration of war or not) either the Owners or the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART I if it has cargo on board after discharge thereof at destination or, if debarred under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if the Vessel has no cargo on board, at the port or place at which it then is or If at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery.

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed as deviation.

The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause.

## 20. Excluded Ports

(a) The Vessel shall not be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel;

(b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to n convenient open place and await the Charterers' fresh instructions.

(c) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand. Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owning to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

## 21. General Average and New Jason Clause

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

## 22. Both-to-Blame Collision Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

## 23. Structural Alterations and Additional Equipment

The Charterers shall have the option of, at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and



maintenance of any such alteration or additional equipment.

### 24. Health and Safety

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' instructions as may be appended hereto

### 25. Taxes

Each party shall pay taxes due on its own profit, income and personnel. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.

In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly.

### 26. Early Termination

(a) For Charterers' Convenience - The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement stated in Box 14 and the demobilisation charge stated in Box 16, as well as Hire or other payments due under the Charter Party.

(b) For Cause - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances:

(i) Requisition - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) Confiscation - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.

(iii) Bankruptcy - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business

(iv) Loss of Vessel - If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) Breakdown - If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a

period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18.

(vi) Force Majeure - If a force majeure condition as defined condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days.

(vii) Default - If either party is in repudiatory breach of its obligations hereunder.

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments due.

### 27. Force Majeure

Neither the Owners nor the Charterers shall be liable for any loss, damages or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners' or the Charterers' employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.

### 28. Notices and Invoices

Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate.

### 29. Wreck Removal

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.

### 30. Confidentiality

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data.

### 31. Law and Arbitration

*) (a) This Charter Party shall be governed by English law and any dispute arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or



p.t.o.

re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

*) (b)     Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.

*) (c)     Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.

*) (d)     If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply.

*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33.

### 32.  Entire Agreement

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

### 33.  Severability Clause

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect.

### 34.  Demise

Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.

### 35.  Definitions

"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side track thereof.

"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and /or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production. "Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an  "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers.

"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.

### 36.  Headings

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

p.t.o.



# INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) Marine Hull Insurance - Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) Protection and Indemnity Insurance - Protection and Indemnity or Marine Liability insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage for crew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) General Third Party Liability Insurance. Coverage shall be for:
Bodily Injury USD1,000,000.00 per person
Property Damage USD1,000,000.00 per

(4) Workmen's Compensation and Employer's Liability Insurance for Employees. - Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5) Comprehensive General Automobile Liability Insurance. - Covering all owned, hired and non-owned vehicles, coverage shall be for:
Bodily Injury According to the local law.
Property Damage In an amount equivalent to Not Applicable - single limit per occurrence.

(6) Such other insurances as may be agreed.



Code Name: "SUPPLYTIME 89"

# AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE
(Optional, only applicable if stated in Box 28 in PART I)

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the Operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liability for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another signatory under the Owners' direction by virtue a f an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall crate any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

 

# Express 23



**BUILT**

| | |
|---|---|
| Year | 1990 |
| Class | ABS |
| Builder | Aluminium boat Inc. USA |
| Flag | Panama |
| Official No. | |
| Call Sign | HP 5632 |

**DIMENSIONS**

| | |
|---|---|
| Length overall | 110 ft |
| Breadth | 26 ft |
| Depth | 11 ft |
| Draft loaded | 6 ft |
| Gross tonnage | 169 |
| Net tonnage | 50 |

**MACHINERY**

| | |
|---|---|
| Main engines | 4 x Gm 12V 71T1 x 510bhp |
| Propellers | 4 fixed pitch |
| Generators | 2 x GM 3-71 40Kw 115/220V/3/60Hz |

**SPEED / CONSUMPTION**

| | |
|---|---|
| Maximum/cruising | 18/16 knots |
| Fuel/Stby | 0.30 cbm/day |

*Updated 06/10/06*

**CAPACITIES**

| | |
|---|---|
| Fuel oil | 7,444 Gal |
| Water | 7,400 Gal |
| Free deck space | 1040 SQ.FT |
| Deck cargo capacity | 40 long tons |
| Accommodation | 8 crew, 40 pax (seated) , fully air conditioned |

**NAVIGATION/COMMUNICATION**

| | |
|---|---|
| Radar | 2 x Furuno – Range 48 NM |
| Echo sounder | 1 x Furuno LS 6000 |
| Satellite navigation (GPS) | 1 x Koden KGP-98 |
| SSB radio | 1 x Icom - 700 |
| VHF radio | 2 x Sailor Type 2048 |
| Gyro Compass | 1 x Tokyo Keiki |
| Magnetic Compass | 1 x Ritchie |

**FIRE FIGHTING / SAFETY**

| | |
|---|---|
| Monitors | NA |
| Pump capacity | NA |
| Safety Equipment as per SOLAS, Flag and Class Society requirement | |

| | |
|---|---|
| Max speed | 290 ltrs/hrs |
| Cruising speed | 250 ltrs/hrs |
| Economical Speed | 200 ltrs/hrs |
| Idling speed | 135 ltrs/hrs |




**ADDENDUM No. 1 TO THE "SUPPLYTIME 89" CHARTER PARTY , DATED 7th January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "EXPRESS 23 (CREWBOAT)**

**THIS ADDENDUM** made effective from 8th January 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF "EXPRESS 23 (CREWBOAT), shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

## Marine Warranty Survey Inspection

1. The Owners shall rectify points identified as recommendations by the Charterer appointed Marine Warranty Survey Inspection report, to the satisfaction of the Marine Warranty Surveyor, prior to the handover of the vessel to the Charterer at their time and cost provided that these recommendations fall within natural responsibilities of the owner or as is commonly understood under clause 3(b) of the part II of the charter party.

2. All other terms and conditions of the Main Charter Party and its Addenda shall remain the same.


CONSOLIDATED PIPECARRIERS PTE LTD.          TRIDENT AUSTRALASIA

**ADDENDUM No. 2 TO THE "SUPPLYTIME 89" CHARTER PARTY , DATED 7th January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "EXPRESS 23 (CREWBOAT)**

**THIS ADDENDUM** made effective from 15th February 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF "EXPRESS 23 (CREWBOAT), shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

## Charter party Period

1.) The Firm period of the Charter of the Express 23 is hereby extended from the 16th February, 2009 until the 5th March, 2009, in direct continuation of its present Charter at the same Rate and Terms and Conditions as contained in the Main Charter Party and its Addenda.


CONSOLIDATED PIPECARRIERS PTE LTD.          TRIDENT AUSTRALASIA

**ADDENDUM No. 3 TO THE "SUPPLYTIME 89" CHARTER PARTY , DATED 7th January 2009 (MAIN CHARTER PARTY) BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (OWNERS) AND TRIDENT AUSTRALASIA FZE (CHARTERERS) ON THE CHARTER OF "EXPRESS 23 (CREWBOAT)**

**THIS ADDENDUM** made effective from 2nd of March 2009, between BETWEEN CONSOLIDATED PIPE CARRIERS PTE LTD (hereinafter called OWNERS) AND TRIDENT AUSTRALASIA FZE (hereinafter called CHARTERERS) ON THE CHARTER OF "EXPRESS 23 (CREWBOAT), shall form an integral part of the above-mentioned Charter Party. In the event of conflict and/or discrepancy, the provisions contained herein shall take precedence over those contained in the Main Charter Party and its Addenda.

The Owners and the Charterers hereby agreed as follows:

### Charter party Period

1.) The Firm period of the Charter of the Express 23 is hereby extended from the 5th of March, 2009 until the 19th March, 2009, in direct continuation of its present Charter at the same Rate and Terms and Conditions as contained in the Main Charter Party and its Addenda.

CONSOLIDATED PIPECARRIERS PTE LTD.          TRIDENT AUSTRALASIA

# EXHIBIT 7

**AL FATHA MARINE SURVEYORS & CONSULTANTS**

الفتـح لمعـاينـة و وسائـل النقـل البحـري

P.O. Box 11504
Ras Al Khaimah - U.A.E
Tel : (00971 - 7) 2220661 / 2220663
Fax : (00971 - 7) 2220662
Mob. : (00971-50) 7403590
E mail : sobupk@emirates.net.ae



Marine & Cargo Surveyors
Technical & Safety Consultants
Containers & Bulk oil Inspectors
Quantity & Quality Controllers

### CERTIFICATE OF RE-DELIVERY

THIS IS TO CERTIFY THAT M.V. "EXPRESS 23" FLAG PANAMA  GRT 169.00 M.T  NRT 50.00 M.T  HAS BEEN  RE-DELIVERED TO THE DISPONENT OWNERS.  M/s. **CONSOLIDATED PIPE CARRIERS PTE. LTD., SINGAPORE** BY THE CHARTERERS. **M/s. TRIDENT AUSTRALASIA PTY. LTD.,** SUBJECTED TO ALL TERMS & CONDITIONS AND EXCEPTIONS AGREED UPON BETWEEN OWNERS AND CHARTERERS. AS PER CHARTER PARTY

WE ARE INFORMED THAT THE VESSEL IS TO BE RE-DELIVERED ON  ~~SINAH FREE ZONE SHARJAH~~ AT  1365 HOURS ON 29/05/03 L.T. (G.M.T. 0945 HOURS ON 29/05/03 )

BASED ON THE VESSEL'S TANKS SOUNDING BY US IN CONJUNCTION WITH THE CHIEF ENGINEER, AND FROM SHIP'S CALIBRATION TABLE. VESSEL'S CONSUMPTION AND WITH REFERENCE TO THE OFFICIAL LOG BOOK. THE ESTIMATED QUANTITY OF BUNKERS REMAINING ON BOARD AT THAT TIME WAS CALCULATED AND AGREED TO AS UNDER

| | | |
|---|---|---|
| **DIESEL OIL** | : | 16,540 LTRS |
| **LUBE OIL** | : | 476 LTRS |
| **HYDROLIC OIL** | : | 40 LTRS |
| **FRESH WATER** | : | 8195 LTRS |

MASTER                     CHIEF ENGINEER                     SURVEYOR

# EXHIBIT 8

## Consolidated Pipe Carriers Pte Ltd

152 Beach Road #12-03
Gateway East
189721
Singapore

| | | | | | |
|---|---|---|---|---|---|
| CUSTOMER NO : | TRIDENTUSD | | CUSTOMER NO.: | | TRIDENTUSD |
| PAGE: | 1 | | PAGE: | | 1 |
| DATE: | 31/07/2009 | | DATE: | | 31/07/2009 |

SOLD TO:

TRIDENT AUSTRALASIA FZE
P.O.Box 122319
Saif Zone, Sharjah
United Arab Emirates

REMIT TO ADDRESS:

**Vessel : Express 23**

| DOCUMENT | DOC DATE. | TY. | REFERENCE/APPLIED NUMBER | DUE DATE | AMOUNT | PAID | BALANCE |
|---|---|---|---|---|---|---|---|
| 01/CHAR/0014/09 | 31/01/2009 | IN | Hire from 17 Jan 09 to 31 Jan 09 - Express 23 | 31/01/2009 | 42,000.00 | -42,000.00 | 0.00 |
| 02/CHAR/0041/09 | 02/02/2009 | IN | Hire from 1 Feb 09 to 28 Feb 09 - Express 23 | 02/02/2009 | 78,000.00 | -78,000.00 | 0.00 |
| 03/CHAR/0071/09 | 02/03/2009 | IN | Hire from 1 March 09 to 31 March 09 - Express 23 | 02/03/2009 | 87,300.00 | -87,300.00 | 0.00 |
| 04/CHAR/0097/09 | 01/04/2009 | IN | Hire from 1 Apr 09 to 30 Apr 09 - Express 23 | 01/04/2009 | 84,000.00 | | 84,000.00 |
| 05/CHAR/0114/09 | 20/05/2009 | IN | Hire from 1 May 09 to 20 May 09 - Express 23 | 20/05/2009 | 54,745.83 | | 138,745.83 |
| CPC-DN09-063 | 03/06/2009 | DN | Charge Back on Expense Made by CPC on Behalf | 03/06/2009 | 347.75 | | 139,093.58 |
| CPC-DN09-107 | 15/07/2009 | DN | Fresh Water for Express 23 | 15/07/2009 | 110.68 | | 139,204.26 |
| 07-CHAR-0018-09 | 15/07/2009 | CN | Song Credit for Express 23 Consumables | 15/07/2009 | -327.66 | | 138,876.60 |
| | | | Total Principal | | | | 138,876.60 |

Invoices reflected at paid column has been paid by Janoob Tasisat Co

Thank you for keeping your account current

| | | | | |
|---|---|---|---|---|
| IV Invoice | PY App and Recept | JC Unapplied Cash | Credit Limit: | 0.00 |
| DB Debit Note | PD Partial Discount | RF Refund | Credit Available: | 0.00 |
| CN Credit Note | AD Adjustment | | Total | 138,876.60 |
| FN Finance Payable | PP Prepayment | | | |

TO ENSURE PROPER CREDIT, PLEASE CHECK
THE ITEMS YOU ARE PAYING IN THE
COLUMN

Total     138,876.60

| 1 - 30 DAYS O/DUE | 31 - 60 DAYS O/DUE | 61 - 90 DAYS O/DUE | OVER 90 DAYS O/DUE | Consolidated Pipe Carriers Pte Ltd |
|---|---|---|---|---|
| 0.00 | 130.77 | 54,745.83 | 84,000.00 | |



# EXHIBIT 9

 **Nordea**

**Confirmation**
Payment received

2206

INTERNATIONAL BUNKERING
(ME) DMCC
OFFICE NO.ESO:10, PO BOX NO.9204
DUBAI WORLD TRADE CENTRE
DUBAI, UAE

Date 2009.02.13
Account No 5036137616

Reference 7463016862206

## PAYMENT FROM ABROAD

| | | |
|---|---|---|
| Received amount | 9,050.00 | USD |
| We have 2009.02.13 (value 2009.02.13) credited account No 2206 5036 137 616 | 9,050.00 | USD |

Beneficiary:
5036137616
INTERNATIONAL BUNKERING DMCC
PO BOX 9204
DUBAI U.A.E

At the request of:
/016002484243454
TRIDENT AUSTRALASIA PTY LTD
125A ROYAL STREET
EAST PERTH WA

Original amount 9,075.00 USD

Message to beneficiary:
/RFB/INVOICE PMT INVOICE 11787
PAYMENT

Remitter's bank:
AUSTRALIA AND NEW ZEALAND
BANKING GROUP LIMITED
G.P.O. BOX 537 E, 100, QUEEN STREET
MELBOURNE, VI 3001 - AUSTRALIA

$1.025 = $25

BRN08/0232

POSTED

Nordea Bank Danmark A/S
Erhvervsafdeling Fyn, Corporate adviser Jan Riising
Vestergade 64  Postbox 909 5000 Odense O
Tel +45 66 12 73 23 Fax +45 65 91 24 35
www.nordea.dk
Company registration number 13522197, Copenhagen, Denmark

4373545480



**Nordea**

INTERNATIONAL BUNKERING
(ME) DMCC
OFFICE NO.ESO:10, PO BOX NO.9204
DUBAI WORLD TRADE CENTRE
DUBAI, UAE

2206

**Confirmation**
Payment received ✓

Date 2009.02.13
Account No 5036137616

Reference 7463016862205

**PAYMENT FROM ABROAD**

Received amount                                             4,005.00   USD

We have 2009.02.13 (value 2009.02.13) credited account No 2206 5036 137 616        6,005.00   USD

Beneficiary:
5036137616
INTERNATIONAL BUNKERING DMCC
PO BOX 9204
DUBAI U.A.E

At the request of:
/016002484243454
TRIDENT AUSTRALASIA PTY LTD
125A ROYAL STREET
EAST PERTH WA

Original amount 6,030.00 USD

Message to beneficiary:
/RFB/INVOICE PMT INVOICE 11836
PAYMENT

Remitter's bank:
AUSTRALIA AND NEW ZEALAND
BANKING GROUP LIMITED
G.P.O. BOX 537 E. 100, QUEEN STREET
MELBOURNE, V13001 - AUSTRALIA

Bk. chg = $ 25/-

BRV08/0231

POSTED

Nordea Bank Denmark A/S
Erhvervsafdeling Fyn, Corporate adviser Jan Fisting
Vestergade 64, Postbox 900 5000 Odense C
Tel +45  96 12 73 23 Fax +45  65 91 24 36
www.nordea.dk
Company registration number 13522197, Copenhagen, Denmark

4373545480



2206

INTERNATIONAL BUNKERING
(ME) DMCC
OFFICE NO.ESO:10, PO BOX NO.9204
DUBAI WORLD TRADE CENTRE
DUBAI, UAE

**Confirmation**
Payment received

Date 2009.03.02
Account No 5036137616

Reference 7463016934794

## PAYMENT FROM ABROAD

Received amount                                                  70,406.20   USD

We have 2009.03.02 (value 2009.03.02) credited account No 2206 5036 137 616     70,406.20   USD

Beneficiary:
5036137616
INTERNATIONAL BUNKERING DMCC
PO BOX 9204
DUBAI U.A.E

Message to beneficiary:
/RFB/INVOICE PMT INVOICE 11881,
11887, 11885 AND 11842 PAYMENT

At the request of:
/016002484243454
TRIDENT AUSTRALASIA PTY LTD
125A ROYAL STREET
EAST PERTH WA

Remitter's bank:
AUSTRALIA AND NEW ZEALAND
BANKING GROUP LIMITED
G.P.O. BOX 537 E, 100, QUEEN STREET
MELBOURNE, VI 3001 - AUSTRALIA

Original amount 70,431.20 USD

Bk.Charge = $25/-

BRV08/0278

POSTED

Nordea Bank Danmark A/S
Erhvervsløsning Fyn, Corporate advent Jan Rød ing
Vestergade 64, Postbox 809 5000 Odense C
Tel +45   66 12 73 28 Fax  +45   66 91 24 35
www.nordea.dk

Company registration number 13522197, Copenhagen, Denmark

4373543460

# EXHIBIT 10

# Trident Australasia

125 A Royal St East Perth
Western Australia 6004

Ph: +61 8 9225 2100



' Home

## Latest News

**11/06/09**

Trident Group of Companies has acquired two new construction and accommodation barges. These barges will be further enhanced in order to provide cost effective services and solutions to the offshore oil and gas, as well as the mineral resources industries.

**28/05/09**

20km of umbilical installation has been successfully completed as part of the Nexus Longtom Project in Australia

**13/05/09**

Nexus Longtom pipeline has been installed in Bass Strait Australia – in record time and with a 99.6% weld pass rate and Zero "Lost Time injuries".

## Company Profile

Trident Australasia was established in its own right in early 2005.

The Company's origins arise from blue-chip international energy and services majors, underpinning the nature and quality of our team's proven capability.

With its head office in Perth, Australia and branch offices in Singapore, Sharjah (UAE), Tehran (Iran) Kuala Lumpur and Labuan (Malaysia) as well as New Delhi, India, Trident Australasia is a leading provider of offshore and onshore development services for the oil and gas as well as the minerals and water resources industries.

Trident Australasia specialises in innovative solutions for marginal offshore oil and gas developments

Trident Australasia also provides vessel and barge equipment as well as construction and marine personnel for onshore and offshore projects.
With a highly experienced management team, Trident Australasia has, over the last few years, successfully completed a number of high profile projects and has built up a strong reputation with leading operators and contractors such as Nexus Energy, Roc Oil, MDL Energy, IOEC, IOOC, PBJV, Petronas, Multiplex and the Water Corporation in Western Australia.

**Trident Offshore Services**

20 Harbour Drive #04-04. PSA Vista. Singapore 117612

**Phone:** (65) 6542-1996